**James H. FLOYD, Plaintiff-Appellant,**

v.

**Robert H. FINCH, Secretary of Health, Education and Welfare, Defendant-Appellee.**

No. 19177.

United States Court of Appeals, Sixth Circuit.

Feb. 26, 1971.

McAllister, Senior Circuit Judge, dissented in lengthy opinion.

Louis E. Peiser and Irving S. Zeitlin, Memphis, Tenn., for appellant.

William D. Ruckelshaus, Asst. Atty. Gen., Morton Hollander, Robert M. Heier, Attys., Department of Justice, Washington, D. C., Thomas F. Turley, Jr., U. S. Atty., Memphis, Tenn., for appellee.

Before WEICK and McCREE, Circuit Judges, and McALLISTER, Senior Circuit Judge.

WEICK, Circuit Judge.

This appeal is from an order of the District Court granting summary judgment in favor of the Secretary in a proceeding to review the denial of disability benefits under the Social Security Act. 42 U.S.C. § 423.

Appellant, Floyd, a truck driver for Armour & Co., who was 55 years of age, on November 3, 1964 filed his application for disability benefits, alleging that since June 8, 1964 he had been unable to engage in substantial gainful activity because of arthritis. His application was denied initially and again on reconsideration by the Social Security Administration. He was granted an evidentiary hearing before a hearing examiner, who adopted findings of fact and concluded that Floyd had failed to show by medical evidence that he was suffering from an impairment of such severity as would preclude him from engaging in substantial gainful activity.

Floyd then requested review by the Appeals Council, and his attorney submitted a medical report which indicated arthritis and also a pulmonary condition by history, which had not been considered by the trial examiner. Two additional medical reports were procured by the Secretary: one from an internist, and the other from an orthopedic surgeon.

The Appeals Council considered the evidence before the trial examiner and the new medical reports filed with it, and adopted findings of fact from the entire record. It concluded that Floyd had no pulmonary impairment; that his mild arthritic condition did not prevent him from engaging in substantial gainful activity; and affirmed the decision of the trial examiner.

The District Court, in proceedings to review, found substantial evidence to support the factual findings of the Secretary and granted summary judgment.

Judicial review of decisions of the Secretary is limited. His findings of fact, if supported by substantial evidence, are conclusive. 42 U.S.C. § 405(g); Rose v. Cohen, 406 F.2d 753 (6th Cir. 1969). Courts are not permitted to try the cases de novo; Walters v. Gardner, 397 F.2d 89 (6th Cir. 1968).

Courts may not resolve conflicts in the evidence or decide questions of credibility. Moon v. Celebrezze, 340 F.2d 926 (7th Cir. 1965).

■ In order to be compensable under the 1967 Amendments to the Act, the impairment must result from abnormalities which are "demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d) (3) (1964 ed. Supp. III). These amendments are applicable to the present case as the decision has not become final. Walters v. Gardner, *supra*.

The medical evidence submitted by the Secretary consisted of reports from Doctors Ray, Hoover, Horton, and Whittemore, and the testimony of Doctor Anderson. Claimant submitted hospital records from St. Joseph's Hospital and reports from Doctors Kasselberg and Myhr.

The medical evidence submitted by the Secretary was essentially that claimant had mild arthritis which would not prevent him from engaging in substantial gainful activity. It was also to the effect that his subjective symptoms were not supported by the clinical findings. Dr. Ray stated that his subjective symptoms were far out of proportion to the objective findings.

Dr. Hoover gave evidence concerning movements and activities of claimant in the Doctor's presence, which were inconsistent with the claim of back and neck impairment. He stated:

"It is quite apparent that the patient reacts to light touch and gave quite active resistence to movement when the examiner checked for range of motion. When attention is directed to the back and leg areas, the patient quite obviously gives false responses in straight leg raising and Patrick Hip tests examination. This is quite apparent from the fact that he did not show any limitation of motion or complaint when this area was being observed earlier in the examination without his knowledge."

He further stated:

"This patient's motivation to work is obviously extremely poor. Objective findings do not support the subjective symptoms."

Dr. Anderson in his testimony reviewed the medical findings and opinions and came to the conclusion that claimant did have mild arthritis in his back and neck but—

" * * * [T]he use of his extremities and of his back should be satisfactory for anything except heavy lifting."

He gave his opinion that claimant could work a forty-hour week provided he was not required to lift objects weighing more than ten to twenty pounds.

Dr. Whittemore found mild degenerative reaction in cervical and lumbar spine but "based on reasonable medical certainty that patient should be able to move about, handle objects and perform sustained activity requiring light exertion."

Dr. Horton found no pulmonary involvement. Claimant did have a cough and the doctor recommended that he abstain from smoking.

Dr. Myhr, an internist, who gave a report for the claimant, found that he had "Pulmonary emphysema and fibrosis from history." He did not relate this to any clinical findings but obtained it from claimant as history. Dr. Horton, who made clinical findings, determined that no such condition existed. Dr. Myhr also found that claimant had "(1) Cervical osteoarthritis, severe, (2) Cervical disc syndrome at C5 and C6, and C6 and C7, (3) Osteoarthritis of the lumbar spine." He was of the opinion that claimant—

"is unable to work at this time mainly because of his pulmonary disease and also because of his cervical disc syndrome which is causing him considerable neck pain, and also because of lumbar spine arthritis."

Dr. Kasselberg made reports concerning three examinations during hospitalization of claimant in St. Joseph's Hospital in 1964. His first report was that the lumbar arthritic condition improved with medication. The second report indicated there was an excellent prognosis for improvement, and the third indicated that prognosis as to full recovery was limited but as to the immediate future it was satisfactory. Later, on November 11, 1964, he reported that claimant "was not able to return to work at present and I do not know if he will ever be able to return to his usual type of work." His usual type of work was lifting heavy loads of meat, weighing as much as 229 pounds. The Secretary did not claim that he could do this, but that he could engage in substantial activity.

Claimant testified that he walks about eight blocks a day; that he mows his lawn with a power mower; that he walks to the grocery store for groceries; that he drives an automobile, the longest trip during the last twelve months being about 150 miles; that he spends most of his time (about three hours a day) in a small building, 10' x 10', in his back yard, cutting out spice racks from wood with a jig saw, which he does as a hobby; and that he also makes wooden chains.

■ In view of the medical evidence that claimant's subjective symptoms were not supportable, and the evidence of his false responses in one of the examinations, we cannot criticize the trial examiner for his questioning of claimant. The hearing examiner found that claimant could perform many sedentary occupations listed in the Dictionary of Occupational Titles, Volumes I and II, published by the Department of Labor. It was proper for the Secretary to take administrative notice that light work ex- isted in the national economy. Breaux v. Finch, 421 F.2d 687 (5th Cir. 1970).

The fact that the claimant receives from other sources about $223 per month in disability and retirement pension and insurance is irrelevant to our inquiry.

■ In our opinion there was substantial evidence to support the factual findings of the Appeals Council. It is not our function to resolve conflicts in the evidence or determine issues of credibility of witnesses. This is solely the function of the Secretary.

The law required the claimant to prove that his impairment was demonstrable by medically acceptable clinical and laboratory diagnostic techniques. We agree with the Secretary that claimant failed to do this.

Affirmed.

Judge McCREE concurs.

McALLISTER, Senior Circuit Judge (dissenting).

The majority opinion states that the District Court "found substantial evidence to support the factual findings of the Secretary and granted summary judgment," and that his "findings of fact, if supported by substantial evidence, are conclusive," and sustained such judgment.

It used to be easy enough for an appellate court to affirm an administrative agency on the ground that the findings were supported "by substantial evidence," if it could find just a trace of evidence to support them. But that is not the case anymore. Congress grew critical of such affirmances which ignored conflicting evidence and, in turn, brought about harsh criticism of the courts for such decisions on the ground that cases were affirmed merely because the appellate court could find evidence in the record which, viewed in isolation, substantiated a Board's findings.

In Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456,

Mr. Justice Frankfurter declared: "Protests against 'shocking injustices and intimations of judicial 'abdication' with which some courts granted enforcement of the Board's orders stimulated pressures for legislative relief from alleged administrative excesses," with the result that the Taft-Hartley Act provided that such findings of fact must be "supported by substantial evidence *on the record as a whole. * * * We conclude, therefore, that the Administrative Procedure Act and the Taft-Hartley Act directs that courts must now assume more responsibility for the reasonableness and fairness of Labor Board decisions than some courts have shown in the past. Reviewing courts must be influenced by a feeling that they are not to abdicate the conventional judicial function. Congress has imposed on them responsibility for assuring that the Board keeps within reasonable grounds. * * * The Board's findings are entitled to respect; but they must nonetheless be set aside when the record before a Court of Appeals clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both."

Since, as hereafter appears, there have been a great number of reversals compared to the affirmances of the decision of the Hearing Examiner and the Secretary, this court has held in Sayers v. Gardner, 380 F.2d 940, 943 (C.A.6), that

*"the records should be carefully examined and reviewed by the courts, and an opinion should generally be written, setting forth the facts and law, to show that the courts have, in reality, assumed more responsibility for the reasonableness and fairness of the decisions of federal agencies, than some courts have shown in the past*; and that reviewing courts must be influenced by a feeling that they are not to abdicate the conventional judicial function, as we have been directed and cautioned by the Supreme Court in Universal Camera Corp. v. National Labor Relations Board, *supra*, for this case obviously means that courts should scrutinize the decisions of agencies, more than they have in the past, to ascertain whether they are reasonable and fair. The great number of errors and reversals, in the past, in these cases, constitute a warning signal." (Emphasis supplied.)

The appellate courts obviously took notice of the commands of the Supreme Court as to "searching the record" in review of agency findings, since little has been said by the Supreme Court on that subject since.

However, in disability benefit cases under the Social Security Act, the decisions of Hearing Examiners and their findings of fact and conclusions of law, upon which the Secretary's decisions were based, became so unjustifiable and hostile to the rights of poor people who became disabled, that the reviewing federal courts were shocked, and repeatedly reversed those decisions; and later adjudications, reversing like decisions, pointed out the unusual number of such cases that the courts were obliged to reverse, compared to the number that were affirmed, and emphasized what the Supreme Court had said as to *searching* examinations of the record.

As an instance, Judge Feinberg in Scott v. Celebrezze, 241 F.Supp. 733, 736 (S.D.N.Y.), emphasized how searching must be the review by the courts of the action of the Secretary, observing that in the cases reported in volumes 227–236 of Federal Supplement, the Secretary had been reversed or remanded 47 times, while upheld only 27 times. Likewise, in Seldomridge v. Celebrezze, 238 F.Supp. 610, 620 (E.D.Pa.), Judge Higginbotham emphasized that for September, October, and November of the 1964 Federal Supplement, the Social Security Administration was reversed in at least 75% of the cases and that 90% of the reversals were because of lack of substantial evidence to support the findings of the Secretary.

In Miracle v. Celebrezze, 351 F.2d 361, 382 (C.A.6), this court commented on the

statement made in Lightcap v. Celebrezze, 214 F.Supp. 209, 216, (D.C.) that the court, as adjured by the Supreme Court "must now assume more responsibility for the reasonableness and fairness" of the federal agencies "than some courts have shown in the past," and "Reviewing courts must be influenced by a feeling that they are not to abdicate the conventional judicial function." And the court emphasized:

> "The review of cases for disability benefits under the Social Security Act is onerous from many aspects. The case before the Hearing Examiner is heard informally. This means that there is practically no examination or cross-examination of any witnesses, except the claimant himself, usually a man whose life has been one of hard labor, and with little education; and, sometimes, a Vocational Counselor. The record, for the most part, consists of letters and written statements regarding the disability claimed, the extent of it, or the lack of it. Many of these statements consist of official printed forms of applications and reports filled in, in the handwriting of various individuals; and their reproduction in the record often requires laborious decipherment. These records call for searching investigation by the district courts, and further searching investigation by appellate courts."

In the light of the majority opinion, therefore, it appeared that this opinion should clearly show that a searching examination of the record has been made, and the undisputed facts fully stated; and it is this consideration which accounts for the length and detail of this opinion.

It is now agreed by this Court that the evidence before the Hearing Examiner was not sufficient to support the findings of fact of the Secretary that the applicant was able to engage in substantial

gainful employment. The only issue, therefore, is whether the additional evidence adduced before the Appeals Council, together with the entire record, can be considered affording substantial evidence to support the Secretary's determination that the applicant was able to engage in substantial gainful employment.

The controlling evidence in this case is, therefore, that adduced before the Appeals Council. That evidence consisted of a medical report by Dr. Lamb B. Myhr; a medical report by Dr. Glen E. Horton, and a medical report by Dr. Wendell L. Whittemore.

Dr. Myhr, as related more fully hereafter, reported:

> "[Claimant's] physical examination at this time shows him to be a chronically ill man, and appears older than stated age. * * * There is tenderness over the cervical spine bilaterally with limitation of motion of his cervical spine and pain in his neck is made worse by flexion and extension of his cervical spine. * * * There is considerable tenderness over the lumbar spine with a positive straight leg raising bilaterally. No reflex changes are noted. He wears a lumbosacral belt because of his back pain.

> "X-rays of his cervical spine show marked spondylosis in the region of C5–C6 and also C6–C7. * * *

> "In summary, this man has (1) Cervical osteoarthritis severe, (2) Cervical disc syndrome at C5 and C6, and C7, Osteoarthritis of the lumbar spine * * *.

> "In my opinion this man is unable to work at this time because * * * of his cervical disc syndrome, which is causing him considerable neck pain, and also because of lumbar spine arthritis." [1]

In summation, Dr. Myhr's examination and report are explicit in stating that

---

1. We have omitted from Dr. Myhr's report any mention of pulmonary emphysema and fibrosis, *from history*, because obviously that mention by Dr. Myhr was made "from history," meaning some report by the Veteran's Administration, or by another physician or hospital.

the applicant was a chronically ill man, with tenderness over his cervical spine bilaterally with limitation of motion of his cervical spine, with pain in his neck made worse by flexion and extension of his cervical spine, and considerable tenderness over his lumbar spine, wearing a lumbo-sacral belt because of his neck pain, and with spondylosis of his cervical spine between C5–C6, and between C6 and C7; that applicant had severe cervical osteoarthritis, cervical disc syndrome at C5, C6 and C7, and osteoarthritis of the lumbar spine; and that Dr. Myhr's opinion, from his examination of the applicant, was that he was unable to work at that time because of his cervical disc syndrome, which was causing considerable neck pain and because of his lumbar spine arthritis. This examination and report of Dr. Myhr, dated October 23, 1965, called for by the Appeals Council, was comprehensive and *definite*. It further substantiated the final report dated November 11, 1964, of applicant's treating physician, Dr. Kasselberg, which was accompanied by his attached notes and summaries.

If Dr. Myhr's report is alone considered by the Appeals Council, together with the Hearing Examiner's report, it could not afford substantial evidence for the Secretary's decision, for the Hearing Examiner's report was based upon an erroneous view of claimant's so-called concessions.

To support the Secretary's decision, there must be further evidence adduced before the Appeals Council, then, that can be considered evidence to support the Secretary's decision.

The only evidence in addition to that of Dr. Myhr, adduced before the Appeals Council, was that of Dr. Glen E. Horton, and Dr. Wendell L. Whittemore, with a report attached to Dr. Horton's report by Dr. Harry E. Davis. Dr. Davis' report is concerned with graphs of arterial blood studies. It is not explained; and is irrelevant in view of no claim being made for ailments arising therefrom.

We, thus, have, in addition to Dr. Myhr's report, the reports of Dr. Horton and of Dr. Whittemore to consider as the additional evidence before the Appeals Council, with regard to applicant's disability.

Dr. Horton specializes in pulmonary diseases, and, apparently, it was for this reason alone that his views were sought by the Appeals Council. Inasmuch as there is no claim here for pulmonary disability, most of Dr. Horton's evidence in this area can be excluded. Dr. Horton stated: "This patient has also been seen in Orthopedic Consultation follow up as well apparently on February 28, 1966." Dr. Horton's report was dated February 23, 1966, so he must have known at the time he made his report that Dr. Whittemore had examined applicant on February 28, 1966.

Dr. Horton, the specialist in pulmonary diseases, sets forth in his report, referring to applicant, whom he examined:

"His chief complaint is 'arthritis in my hips, and spine and neck.'

"The patient relates that he has had back pain and neck pain, periodically since 1950 with hospitalization at the St. Joseph Hospital by his family physician, Dr. Lyman A. Kasselberg, and has also been seen in Orthopedic Consultation by Dr. Ted Galy and also in Neuro-surgical Consultation by Dr. Peter Wallace, when hospitalized at the St. Joseph Hospital in 1964, it was felt he had hypertrophic arthritis. The patient relates he sees Dr. Kasselberg approximately once every three weeks for an injection and he states, 'My hips ache and hurt all the time. I have to change my position all the time. It seems like the bones just throb from my hips to my knees.'

"The patient also relates 'my left arm stays asleep all the time and stings. When I turn my head to the right and back, the feeling comes back just like turning a light on. I have to wear this neck brace to hold my head up and

it helps the numbness some in my arm, but it is always there and I also wear a steel back brace. My left leg is worse than my right * * *.'

"Other history indicates he has sweating arm pits and takes medication for nerves and arthritis * * * he has numbness and tingling in his hand particularly in his left hand * * *.

"Patient is a 56 year old white male who is wearing a neck collar, but did not appear to have any abrasions from this. He apparently did not have his steel back brace on this day of examination, although examination was primarily an evaluation of his pulmonary status."

It seems curious that in a pulmonary examination, Dr. Horton did not know whether applicant was wearing his steel brace. However, Dr. Horton further reported:

"He is somewhat thin and looks somewhat worn for the years. Actually his chief complaints are 'My neck, my legs, and my back * * *' He is wearing a neck collar, and objective evaluation of movement of the neck is a little bit difficult as there appears to be some hyper-reaction although he states he gets referred pain to the left arm. However, I would defer to the Orthopedic consultant's examination and finding. * * * From the orthopedic and arthritic standpoint, I will defer to the specialist to which he has been referred for this. There is considerable disportation between the apparent subjective complaints of the patient and the objective finding observed here, but here again I feel that further documentation from an orthopedic consultant should have first priority in this regard * * *."

The principal point to be noted in the foregoing is that there were no *objective orthopedic findings* noted or mentioned by Dr. Horton. So, as far as the evidence of Dr. Horton goes, the orthopedic diagnosis of Dr. Myhr is unquestioned, and nothing appears to detract from Dr. Myhr's view that applicant is unable to work because of cervical and lumbar spinal arthritis.

We, then, have discussed two of the three persons producing evidence before the Appeals Council, Dr. Myhr and Dr. Horton. As the evidence before the Appeals Council now stands, then, the only orthopedic evidence—which is the basis of applicant's claim—is the evidence of Dr. Myhr to the effect that applicant is unable to work because of his severe cervical osteoarthritis, his cervical disc syndrome at C5, C6, and C7, and his osteoarthritis of the lumbar spine.

There remains now only the evidence of Dr. Wendell L. Whittemore to consider as being the basis on which the Appeals Council affirmed the decision of the Secretary. Dr. Whittemore was hired in this case by the Secretary.

It is upon the evidence of Dr. Whittemore that the case of the Secretary rests, and to prove that case, the evidence of Dr. Whittemore must constitute substantial evidence that the applicant can, in the language of the statute, perform susbtantial gainful employment.

Dr. Whittemore's evidence is:

"[Applicant] was discharged from the Army in 1946 with a 60% disability for arthritis and nerves. After that he worked as a truck driver for Armour and Company, and continued working for them until June 4, 1964, when he stopped because of back pain and blackouts. He was advised to retire by Armour and Company and by his family physician, Dr. Kasselberg. * * * He localizes his pain across the lower back essentially lumbosacral, sacroiliac, and gluteal in distribution. * * * Regarding the legs, his pain at times starts in the lower back and extends into the back of the hips and legs, sometimes to the heels, but most of the time it is above the knees. His pain is aggravated by activity, such as standing and sitting, if prolonged, bending and lifting, particularly when he is nervous. His pain is described as an ache, also a soreness. He usually does not have sharp, severe catches of

pain. It does vary and to some extent varies with periods of rest, but generally, he is quite stiff and sore in the morning and seems to improve a little after he limbers up. In the mornings, he usually takes about four aspirins, and during the day, he takes about eight aspirins. He emphasizes that his pain is constant, that he has some pain all of the time. Regarding the neck, it has been hurting him for about three years. There has been no injury. It started getting stiff and sore. He began to notice pain when he turned his head. The pain extended into the base of the neck and into the left shoulder region, may go down to the shoulder but seldom into the arms. However, the arms have a tendency to go to sleep from the elbow down to the hand. The hand is worse and stays asleep almost constantly, described as almost a constant tingling in the hand. This is especially bad at night and frequently wakes up with the hand asleep. He has no complaints at all regarding the right arm. He has worn a collar for his neck about three years at the advice of Dr. Kasselberg. He wears it PRN when he has pain. It seems to help but does not give complete relief. He wears a corset. This was ordered for him when he was hospitalized at St. Joseph Hospital in June 1964, by Dr. Kasselberg. He was admitted at this time for evaluation regarding his back pain, and a myelogram was done by Dr. Wallace. He stayed in the hospital about one week. He was readmitted to St. Joseph Hospital in June 1964 and again in August 1964, staying 12 to 14 days respectively. Treatment consisted of physical therapy, traction, and a corset. He says the corset helps. It gives him some relief but does not relieve all of his pain. The patient had surgery in 1957. Part of his lung was removed because of his spitting up blood. In 1947, an epigastric hernia was repaired by Dr. McCaughan. In 1951, his appendix was removed by Dr. Kasselberg. He had meningitis when he was 38 years old and was treated at the Isolation Hospital.

"EXAMINATION: The patient is 56 years old, 5 ft. 9½ in. tall, average weight 140 lbs. The patient is slender. The pelvis is level. He has relatively good standing posture. There is a large scar, right chest, consistent with chest surgery. The lumbar segmentation on movement is good, at least 3+ flexion. He does complain of pain on flexion, also recovery from flexion and backward bending. He flinches on hyperextension and on lateral bending. There is generalized soreness to palpation through the lower back, but no intrinsic muscle spasm is demonstrated. There is no paraspinal tightness. There is soreness to palpation in both sciatic notches, and left is worse. There is no thigh pain. There is no pain along the course of the sciatic nerve in the thigh. With the patient sitting, he flexes the lumbosacral well and with relatively little pain. There is no soreness to palpation about the hips and trochanteric regions. Range of motion of the hips is normal. Range of motion of the knees is normal, and there is no crepitation or effusion. Straight leg raising is full 90° without any definite sciatic pain, and deep tendon reflexes are normal. Leg lengths are 37 in. The right calf is 12½ in., left calf 12½ in. Both thighs are 16¾ in. Cervical spine range of motion is flexion 3+ with pain, extension 4+, lateral bending, left, 2+, guarded and painful. Right lateral bending is 2+, no pain. Left rotation is 4+ with pain, right rotation is 4+, no pain. Both shoulders have a normal range of motion, no pain, no atrophy, and no local tenderness. Deep tendon reflexes, upper extremities, are normal. Both arms measure 10½ in, at the midbiceps. The patient moves about the room without a limp. He gets on and off the examining table with ease. He squats easily. He raises on the toes and heels without effort and without any trouble. Circulation

is good. There is no evidence of any extensor weakness in the feet and ankles.

"X-RAYS: Cervical Spine, AP Film: Essentially normal in appearance. Some degenerative reaction is noted. Lateral Film: Shows a degenerative reaction between C–4—C–5, between C–5–C–6, and between C–6—C–7. C–5 and C–6. show considerable distortion from osteophytes anteriorly. The interspaces between C–5—C–6 and C–6—C–7 are very narrow. The cervical curve is flattened. There is no reversal. Lumbar Spine, AP Film: Shows five lumbar segments, spina bifida occulta S–1, contrast media noted. Lateral Film: Shows some mild degenerative reaction, L–2–3–4. Interspaces, however, are well maintained.

"In regard to the cervical spine, the patient has a degenerative joint disease which is advanced and old. The lesions consist of discogenic degeneration, C–4–5–6 and 7. This condition is not necessarily painful. Lesions of this type are frequently seen in patients with no symptoms. However, a certain amount of vulnerability to stress is valid, and for this reason, activities requiring arduous exertion would be objectionable.

"I believe that this patient could perform sustained physical activity requiring light exertion.

"Concerning the lower back, there is some degree of degenerative joint disease which is mildly advanced. His pain appears localized in the lumbosacral area without any evidence of radicular nerve involvement or intrinsic reflex muscle spasm.

"It is my opinion, based on a reasonable medical certainty, that the patient would not be able to carry out arduous physical exertion, but he should be able to move about, handle objects, and perform sustained activities requiring light exertion."

Now, what does this all mean in the light of a claim for disability benefits under the Social Security Act? It means that in this case, the evidence adduced before the Appeals Council, together with the evidence before the Hearing Examiner, must afford substantial evidence to support the Secretary's determination that the applicant was able to perform substantial gainful work. We agree that the evidence before the Hearing Examiner alone, was not substantial evidence to support the determination of the Secretary. Did, then, the evidence adduced before the Appeals Council and based upon the entire record, support the determination of the Secretary? The answer to this question must be resolved by our conclusions as to the evidence of Dr. Whittemore, since the only other evidence before the Appeals Council was that of Dr. Myhr, whose evidence was to the effect that claimant was unable to work because of cervical osteoarthritis, cervical disc syndrome, and osteoarthritis of the lumbar spine.

The evidence of Dr. Whittemore, then, had to afford substantial evidence in support of the Secretary's determination that the applicant was able to perform substantial gainful employment. Did Dr. Whittemore's evidence afford such support to the Secretary's determination? In our opinion, it did not.

He stated that it was his opinion that claimant would not be able to carry out arduous physical exertion, but he stated applicant should be able to move about. The fact that applicant could move about does not conform to the statutory standard that he be able to perform substantial gainful employment.

Dr. Whittemore added to the ability of moving about, and handling objects, that applicant would be able to "perform sustained activities requiring light exertion." This does not conform to the statutory standard of performing substantial gainful activity. "The activity in which the plaintiff must be able to engage must not only be 'gainful' but it must also be 'substantial.'" Dunn v. Folsom, 166 F. Supp. 44, 49 (D.C.Ark.)

And, now, this case in which so much research has been made, and about which

so much has been written, comes down to the single crucial point: Dr. Whittemore's view and evidence that the applicant should be able to perform sustained activity requiring *light exertion*, fails to meet the statutory standard that claimant can perform substantial gainful activity.

On this point, it was held in the unanimous opinion of this court in Massey v. Celebrezze, 345 F.2d 146, 157 (C.A.6) that *"in proving that an applicant is not precluded from performing substantial gainful employment, it is not enough to rely upon testimony that a claimant can do 'light work.' What that light work consists of must be specified."* (Emphasis supplied)

In the instant case, no type of "light work" was specified. Strange to say, there was no evidence of such type of work even from a Vocational Counselor; for it is a unique case, in this regard, since no Vocational Counselor was sworn as a witness. Our holding in Massey v. Celebrezze, *supra*, has never been reversed. It is in keeping also with other cases heretofore cited and relied upon by this court.

In Clemochefsky v. Celebrezze, 222 F. Supp. 73, 78 (D.C.Pa.) the court said:

"Once proper medical evidence, buttressed by subjective evidence from claimant, has shown a sufficiently severe impairment, it must be determined if such impairment, plus claimant's educational and work status, preclude any subsantial, gainful activity. Blankenship v. Ribicoff, 206 F.Supp. 165 (S.D.W.Va.1962). In cases of this kind, where the claimant alleges inability to engage in substantial, gainful activity, *and his personal physician, the man in whose charge claimant has entrusted his health, claims likewise, if examining physicians are to dispute this contention, they must give the medical basis for their opinions. It is not sufficient to say that a man suffers some form of physical impairment yet can do 'light work.'* It must be shown medically that he can perform the physical activities certain jobs require without serious aggravation to present physical impairment or to general health. Otherwise, the Hearing Examiner's findings would amount to pure speculation." (Emphasis supplied.)

From the foregoing, it seems obvious to the writer that the evidence adduced before the Appeals Council did not, when considered with the entire record, afford substantial evidence to support the Secretary's determination.

After a meticulous examination of the record, we are of the opinion that: (1) Appellant's disability from performing substantial gainful employment was sustained by substantial evidence; (2) The determination of the Hearing Examiner that appellant, although disabled from returning to his former work, could engage in substantial gainful activity by performing many of the jobs listed in "The Dictionary of Occupational Titles," concerning which no witness testified and no evidence was introduced, was not supported by substantial evidence; (3) The Hearing Examiner and the Appeals Council committed prejudicial, reversible error by failing to employ the proper legal standard in making their determination that appellant was not disabled through their application of the rule in Theberge v. United States, 2 Cir., 87 F. 2d 697, 698, which this court has repeatedly held to be reversible error; (4) That the Hearing Examiner and the Appeals Council were guilty of reversible error in holding that Congress established a conservative program for the allowance of disability benefits, whereas the Act must be liberally construed to favor the granting of such benefits, and (5) The Hearing Examiner based his cross-examination of appellant on misstatements of the evidence to the disadvantage of applicant; the Hearing Examiner repeatedly badgered appellant because he was receiving veteran's compensation, retirement pension, and payments for total disability as a result of his employer's pension plan, on the ground that he was not looking for work, in spite of the fact that his doctor had advised

against it, and both the employer's physician and his own physician had found that he was permanently and totally disabled; and the Hearing Examiner by the manner of his cross-examination, caused appellant, who was nervous and was suffering from a chronic anxiety reaction (connected with his war service), to agree, because of his sudden indignation, that he could perform certain work, such as egg candling and other "light" occupations, without regard to the evidence that he was totally and permanently disabled, although his own evidence that he suffered pain continuously and could stand for only a short time, sit for a short time and that it was necessary to relieve his pain by lying down. As a result, the Hearing Examiner, who is required to hear applicants, or their attorneys, patiently, kindly, and courteously,[2] displayed prejudicial bias in denying appellant's application, and the decision of the Secretary based thereon should be reversed.

Moreover, the Hearing Examiner committed error in dismissing the evidence of the practicing physician who had been treating appellant over a period of seventeen years on the erroneous ground that the physician did not know much about applicant; and the Hearing Examiner erroneously accepted and relied upon, in deciding the case, the evidence of physicians who were employed and paid by the Social Security Administration and had seen the applicant on only one occasion for a routine examination, as against the evidence of appellant's physician who had treated him for those many years, as well as the evidence of another physician whose evidence was that appellant was permanently and totally disabled. Such a single examination by a physician, or physicians, for the Social Security Administration, contrasted with the evidence of the practicing physician who had been treating the applicant for a period of years, could not, under the adjudicated cases, be the basis of a finding supported by substantial evidence.

As early as February 26, 1962, appellant was admitted to St. Joseph Hospital in Memphis, Tennessee, for treatment of his arthritis by Dr. Lyman A. Kasselberg, his attending physician. Appellant was discharged on March 10, 1962, with a diagnosis of cervical radiculitis and other arthritic conditions, and with a prognosis of "satisfactory."

Two years later, on June 8, 1964, appellant was admitted to the hospital as a result of a "black-out," which he suffered while working at home on a sink. He also had back and neck pain which Dr. Kasselberg diagnosed as cervical and lumbar arthritis, stating he gradually improved on medication. While in the hospital, appellant had many X rays taken, and a complete series of tests. It appeared to be impossible to ascertain why he suffered the "black-out." He, however, continued to undergo considerable suffering from arthritic neck and back pains, and he received "shots" from Dr. Kasselberg.

All of the foregoing appears in the reports of Dr. Kasselberg and of Paul L. Lee, Claims Representative of the Social Security Administration. Mr. Lee has also reported that appellant, at the time of contact on November 3, 1964, among other matters, disclosed that he had an eighth-grade education; and at that time he was wearing a brace around his "mid-section." Appellant informed Mr. Lee, during his interview, that he had been nervous and tense for many years, since the conclusion of his service in World War II, which will hereafter be more fully related. He had been granted, according to Mr. Lee, a veteran's disability payment of 50%, of which 30% was awarded because of his nervous condition, which was service-connected. According to Mr. Lee, appellant's fingers on both hands seemed slightly puffed, and he appeared uncomfortable and rubbed his thighs. Mr. Lee noticed that when appellant rose to leave the interview, "he leaned forward on his knees and his back seemed to 'catch' when he

2. Executive Committee of Federal Trial Examiners' Conference. Vol. 27, Federal Bar Journal 391.

rose to leave. * * * He seemed to wobble as if his legs would give way."

When appellant was hospitalized on June 8, 1964, it was the first day that he had missed a workday with Armour because of his arthritis, with the exception of twelve days' hospitalization in 1962. Since 1964, following the instructions and prescription of Dr. Kasselberg, appellant has worn a steel back-brace, or corset, on his lower spine, and a surgical collar, made either of leather or of a stiffly-woven material, for his neck pain.

On July 1, 1964, appellant was again admitted to the hospital for treatment of pain in his back, which Dr. Kasselberg found was aggravated and, at that time, there was considerable pain radiating down the course of both sciatic nerves. There was also tightness of the cervical and lumbar spine musculature with limitation of motion because of this tightness and pain. Pain in the cervical spine, according to Dr. Kasselberg, radiated to both shoulder girdles. Appellant was hospitalized for twelve days on this occasion. He was treated with traction and physiotherapy and cortisone preparations. He also had muscle relaxants and gradually improved. He was discharged as considerably improved and was to be followed on an out-patient basis, with an excellent prognosis.

On August 27, 1964, appellant was again admitted to the hospital because of pain in his cervical spine and pain in the lumbar spine. He had previously responded "to physical therapy and muscle relaxants, tractions, etc." but, as Dr. Kasselberg stated, "lately has gotten progressively worse and is admitted for further definitive studies. * * * There is considerable amount of tenderness over the lumbar spine and considerable amount of limitation of motion of the lumbar spine because of muscle tightness and pain, with radiation of this pain down both sciatic nerves. * * * Straight leg-raising is painful."

Appellant was discharged from the hospital on September 6, 1964, at which time he was treated with Butisolidine Alka, an anti-inflammatory medicine; and he was fitted with a lumbosacral support. His response at that time was quite satisfactory as the treatment resulted in his being "ambulatory," without any difficulty walking up and down steps, and the sciatic nerve pain had almost disappeared. Dr. Kasselberg's diagnosis at this time was: "Hypertrophic arthritis of the lumbar spine with radiculitis," and the prognosis was: "As to full recovery, is limited; as to the immediate future, seems to be quite satisfactory."

On November 11, 1964, Dr. Kasselberg reported: "Since being discharged from the hospital, Mr. Floyd has continued under my care and his recovery has not been too satisfactory. He is not able to return to work at present and I do not know if he will ever be able to return to his usual type work." Later, Dr. Kasselberg stated that appellant would never be able to return to work because of his back condition; and it was when he came to this conclusion that he took the matter up with the physician representing appellant's employer; and the two physicians, as well as the employer, and the two insurance companies concerned, granted appellant a pension for permanent and total disability. Dr. Kasselberg told appellant not to work at all —that he was not "supposed to do anything. The doctor told me not to do anything. * * * The doctor told me not to do any kind of work."

Following the hearing before the Hearing Examiner on August 31, 1965, the Appeals Council granted review of the Hearing Examiner's decision. This review was secured through the efforts of appellant's counsel, thereafter retained, who procured the additional information in the form of a medical report, which was dated October 23, 1965, signed by Lamb B. Myhr, M. D., a member of the Department of Internal Medicine at the Jackson Clinic of Jackson, Tennessee, and submitted to the Appeals Council.

In the report, Dr. Myhr stated that he had examined appellant; that appellant's

main complaint was neck pain and that this pain extended into the posterior surface of his scalp bilaterally; that he had considerable pain through both shoulders and into both arms; that he wore a Thomas collar (already described as a surgical collar of leather, plastic or thickly-woven material, to keep the vertebrae from impinging on the nerves in his neck). Dr. Myhr also stated that appellant complained of severe pain in his low back region and in both legs and hips. He also mentioned the examination and diagnosis by Dr. Kasselberg that appellant was suffering from cervical and lumbar arthritis. Appellant informed Dr. Myhr that he was unable to work because of the pain in his neck, pain in his hips, lumbar region, and legs.

After appellant had been repeatedly hospitalized and his sick pay had been used to the maximum allowance to which he was entitled on the basis of his thirty years of service, Dr. Kasselberg directed appellant not to return to work, and consulted with the physician of Armour and Company, appellant's employer. It was at this time, as previously stated, that Dr. Kasselberg and the employer's physician went over the matter of appellant's physical condition and, as a result, the company, arriving at the conclusion that appellant was permanently and totally disabled, filed for permanent and total disability of appellant under its pension plan. The two insurance companies concerned in the pension plan of Armour and Company agreed with the conclusion of the company, its physician, and appellant's physician, and a pension for permanent and total disability was granted to appellant in the amount of $95.00 a month. For his thirty years of service, appellant also receives $52.00 monthly as retirement pay.

The Personnel Manager of Armour and Company appeared as a witness on the hearing and afterward testified to the foregoing. He was asked by the Hearing Examiner whether appellant was a *very* good employee. He replied: "He was a very good employee." Appellant's earnings for the year before he stopped work on his doctor's orders, amounted to $4,800. On the day he was removed to the hospital, appellant's earnings were much higher than in 1948, as will hereafter appear. As late as the date of the hearing of his claim for disability benefits on August 31, 1965, appellant was seeing Dr. Kasselberg every three weeks. The Government conceded that appellant received tablets for arthritis, and injections continually for pain, at the time of his visits to Dr. Kasselberg; and the latter reported he had placed appellant on Bonine, a drug that remedies dizziness, and Butisolidine Alka, an anti-inflammatous drug.

Dr. Myhr reported:

"His physical examination at this time shows him to be a chronically ill man and appears older than stated age. * * * There is tenderness over the cervical spine bilaterally with limitation of motion of his cervical spine and pain in his neck. * * * There is considerable tenderness over the lumbar spine * * *. He wears a lumbosacral belt because of his back pain.

"X-rays of his cervical spine show marked spondylosis in the region of C 5–C 6 and also C 6–C 7. There is a marked narrowing of the interspace between C 5 and C 6 and C 6 and C 7 with secondary arthritic changes.

* * * * * *

"In summary, this man has (1) Cervical osteoarthritis, severe, (2) Cervical disc syndrome at C 5 and C 6, and C 6 and C 7, (3) Osteoarthritis of the lumbar spine, (4) Pulmonary emphysema and fibrosis from history, (5) Chronic anxiety reaction (service connected).

"It is my opinion this man is unable to work at this time mainly because of his pulmonary disease and also because of his cervical disc syndrome which is causing him considerable neck pain, and also because of lumbar spine arthritis.

Lamb B. Myhr, M. D."

The Appeals Council was, however, not persuaded by Dr. Myhr's evidence to vary its decision from that of the Hearing Examiner, to which it referred and upon which it relied in its conclusion that appellant was not disabled from substantial gainful activity.

At this point, then, we have appellant, fifty-six years old at the time of the hearing, who had been engaged in heavy labor for more than thirty years for Armour and Company. He had become disabled during his service as a soldier in World War II, and since then has received 50% service-connected disability payments from the Veteran's Administration, which amounts to $77.00 a month, a large share of which is for disability caused by arthritis *from which he has been suffering since 1947*.

During the year prior to his application for disability benefits, he had fainted several times, and had been hospitalized as a result of syncope, and because of increasing pain of arthritis in his cervical and lumbar spine. Between June 8, 1964, and August 26, 1964, appellant had been hospitalized four different times for pain from his neck and back. Two doctors, one, his treating physician, agreed that he was permanently and totally disabled. The third physician, Dr. Myhr, giving evidence on appellant's behalf, after a careful examination of him and after taking X rays and setting forth his interpretation of them with the reasons for his opinion, stated appellant was not able to work. His employer, and the two insurance companies involved, granted him his retirement pension and also a pension for permanent and total disability.

This was the workingman, who was described by the Personnel Manager of Armour and Company as having been "a very good employee" during his thirty years of service; who had missed only twelve days of work because of arthritis, during the entire period of his employment; and who presented himself for the consideration of the Hearing Examiner and the Appeals Council wearing a

steel back-brace and corset and a surgical collar around his neck, which had been prescribed by his physician to alleviate his lumbar and cervical pain. In this condition, and because of his pain and repeated hospitalizations, and supported by the opinions of three physicians that he could no longer work, he petitioned for the allowance of disability benefits out of the Social Security fund, to which he had contributed during all of his working years. To his petition, the answer was, "No." In our view, this answer was entirely unjustified. Appellant's proof of his inability to engage in substantial gainful activity was sustained by substantial evidence. The determination that appellant was not disabled from engaging in substantial gainful employment was not sustained by substantial evidence.

The chief cause of appellant's disability is pain. It is claimed by appellant and conceded by the Government that he suffers pain from cervical and lumbar osteoarthritis. Appellant's evidence, and the evidence of his attending physician, as well as that of Dr. Lamb B. Myhr, is that appellant is unable to work because of cervical and lumbar pain. The medical evidence of the Government is, *not* that appellant does not suffer cervical and lumbar pain but that the pain is not severe enough to prevent him from "performing sustained activities requiring light exertion,"—without specifying what kind of work appellant could do. In fact, there is no evidence whatever in the case from any witness as to what work or jobs appellant could perform while suffering from the cervical and lumbar pain from which he, admittedly, suffers. Although it is conceded that appellant could not return to his former work because of his disability, no Vocational Counselor, or other witness, suggested any kind of lighter job he could do. The only discussion of such possible jobs was by the Hearing Examiner, who, admittedly, had no expertise, and who suggested jobs, such as egg candling, that appellant could do, and read into his findings extensively from "The Diction-

ary of Occupational Titles," stating that appellant could perform hundreds of such jobs.

Appellant himself testified on cross-examination by the Hearing Examiner:

"Q. If the grocery man gave you 25 pounds of groceries, or a 25 pound sack of flour, could you carry it 2 blocks without any trouble, in your opinion?

A. When I pick it up a pain grabs me in each hip.

Q. In other words, you don't think you could carry 25 pounds 2 blocks?

A. I wouldn't even pick up 25 pounds. * * *

Q. Has your doctor told you that exercise would be good for you —bending or walking?

A. He told me not to try to do anything. He told me—I told him about hurting trying to work. He says, 'You ain't supposed to do anything * * *.'

Q. Where does [your arthritis] affect you most—your back?

A. Right between my hips and in the hips (indicating).

Q. Your low back and hips?

A. Yes, and my neck.

Q. When did it start?

A. It started in my neck * * * in my hips. When I went to the Army—in my hips when I went to the Army. * * *

Q. Do you have arthritis in all your joints more or less?

A. More or less in all my joints.

Q. Where is it worse—in your back?

A. In my back and my hips.

Q. Where is the worst pain?

A. In my back and my spine (indicating).

Q. In your low back?

A. Yes.

Q. Are you taking any medicine of any kind?

A. Four tablets a day and about four to eight aspirins a day.

Q. Is that four tablets prescription medicine that the doctor gives you?

A. Yes.

Q. And about four aspirins?

A. Four to eight. Some days it's worse.

Q. Is it worse in damp weather—cold weather?

A. A change of weather, you can tell it just as well.

Q. Do you sleep pretty good?

A. No, sir.

Q. On an average how many hours do you sleep in 24 hours. That is a whole day and night put together.

A. Not over six.

Q. Do you ever take sleeping tablets?

A. No, sir. I can go to sleep all right. My arm wakes me up.

Q. What happens to your arm?

A. I turn on my left side and that nerve—and the arthritis will pinch the nerve in my arm and will put it to sleep from there down (indicating) and it hurts so bad it wakes me up.

Q. In other words, it gets numb from your shoulder down?

A. From my elbow down. It doesn't bother me from my elbow up. From my elbow down it's dead and it wakes me up.

Q. How often do you see your doctor?

A. Every three weeks."

In addition to the testimony of Mr. Floyd in support of his application for disability benefits, we repeat that Dr. L. A. Kasselberg had been appellant's attending physician for a period of seventeen years, since 1947, when he first treated appellant for his arthritis by administering "shots" and prescribing pain-killing drugs for him, which continued even during the time of the hear-

ing and during the careful examination by Dr. Myhr, who based his findings— not only upon X rays which he had taken, but on the bodily examination of appellant.

We proceed then to the cross-examination of appellant by the Hearing Examiner and to the reports of physicians employed by the Social Security Administration. Briefly, at the beginning, it should be emphasized that each of the Social Security physicians saw appellant on only one occasion for a routine examination.

Dr. R. Beverley Ray, who, appellant stated, *never examined him*, stated that he "saw" appellant; and his conclusions were: "This patient's subjective symptoms are far out of proportion to the objective findings and I do not consider him sufficiently disabled to justify the granting of Social Security Benefits." This physician apparently had no knowledge of what type of disability justified the granting of Social Security benefits. He did not intimate that appellant was able to engage in substantial gainful employment.

Another physician employed by the Social Security Administration, Dr. Glenn E. Horton, stated with regard to the only real disability upon which appellant relied: "From the orthopedic and arthritic standpoint I will defer to the specialist to which he had been referred to for this." Without taking any X rays of appellant's neck or back— or even seeing any such X rays, he stated: "There is considerable disportation between the apparent subjective complaints of the patient and the objective finding observed here, but here again I feel that further documentation from an orthopedic consultant should have first priority in this regard with my efforts primarily as a specialist in Pulmonary diseases and evaluation of this particular system." Dr. Horton was a specialist in pulmonary diseases.

Another physician employed by the Social Security Administration was Dr. Wendell L. Whittemore, who, after a long history embodying what appellant told him and Dr. Kasselberg's treatment of him, filed his report which appears in extenso on pages 80–82 ante.

Dr. Hoover saw appellant only on this single occasion. He took no X rays of his neck or back. He did not know appellant. His findings, or impressions, were "by history," or only by what he had learned from some other report or statement. His statements that the arthritis of the lumbar spine and arthritis of the cervical spine were *"mild,* by history, [and] relatively asymptomatic," did not constitute anything but hearsay evidence.

Dr. Hoover reported:

"Treatment * * * has been given by Dr. L. A. Kasselberg who is seen every three weeks. * * * *The patient was also seen by Dr. Ted Galyon, an orthopedist and Dr. Peter Wallace, a neurosurgeon. Mr. Floyd states that these doctors placed him on a total disability, and that the company doctor said that he could not work.* * * Supposedly there is numbness and weakness of the left hand and arm from a cervical spine disc, and *this is rather difficult to evaluate.* * * * Presently, staying in one position for an hour or more is said to create extreme discomfort in the back with resulting deep, diffuse pain and marked stiffness. Standing for more than a few minutes is said to cause pain in the legs. This is not a sciatic-type pain, nor is it any radiation of pain from the back area, *but seems to be pain that envelops the hips, thighs and lower legs as that associated with muscle tenderness.* Some tenderness of the muscles is present especially after sleeping in one position for any time. * * * The patient does state that he has numbness of the left arm and hand but his indication of areas of decreased sensation were totally unanatomical." (Emphasis supplied.)

Mr. Lee, the Social Security Administration's Claims Representative, had previously reported that when appellant came to see him, several months before Dr. Hoover's report, *appellant's hands*

*and fingers seemed slightly puffed.* Dr. Hoover also reported the veteran's disability payments of 60% were stopped in 1950. The fact was the disability payments were not for 60% disability, but for 50%, and they were not stopped in 1950, but have continued ever since World War II. Dr. Hoover also reported appellant was "well developed, well nourished, * * * in no acute distress and who does not appear chronically ill." Dr. Horton, another physician for the Social Security Administration, reported of appellant: "He is somewhat thin and looks somewhat worn for the years." Three months before Dr. Hoover reported that appellant did not "appear chronically ill," Dr. Myhr had reported of appellant: "His physical examination at this time shows him to be a chronically ill man and appears older than stated age."

In his report, Dr. Hoover is, therefore, opposed by the reports of Dr. Horton of the Social Security Administration, and by Dr. Myhr.

Dr. Hoover concluded: "Examining the neck reveals the patient to overreact to light touch. * * * Musculoskeletal examination did not reveal *any abnormality of the joints or muscles.* It is quite apparent that the patient overreacts to light touch and gave quite active resistance to movement when the examiner checked for range of motion."

Dr. Hoover ended his report with a statement which we have noticed in other disability benefit cases which have been reversed, by reporting: "The patient's motivation to work is obviously extremely poor." This, without any X rays of his cervical and lumbar spine, and after a single examination. Appellant had said nothing to Dr. Hoover about working; but had reported to him only the opinions of four doctors that he could not work, *the fact of his several hospitalizations,* and that he was seeing Dr. Kasselberg every three weeks, who gave him tablets and injections for arthritis at such times.

Of all the physicians who examined appellant, Dr. Hoover was the only one to state that appellant's motivation to work was extremely poor.

Before discussing the additional evidence submitted on behalf of the Secretary, and upon which the Hearing Examiner based his decision, it is to be remarked that appellant, *contrary to the usual procedure,* was not permitted to be the first witness.

Instead of first hearing appellant's testimony as to pain and disability, the Hearing Examiner swore as a witness, Dr. Anderson, who had never examined appellant, and relied only upon the records of other physicians who had filed reports as to appellant's condition without testifying on the hearing. *Dr. Anderson, further, had heard none of the testimony of appellant, or of the Personnel Manager of appellant's employer, or of appellant's wife, or of any other testimony in the case.* Nevertheless, this medical advisor, encouraged by questions from the Hearing Examiner, testified in a way calculated effectively to block appellant from receiving any benefits for his disability on the ground that appellant was not disabled from engaging in substantial gainful employment.

Dr. Anderson testified concerning examinations of appellant by Dr. Kasselberg in 1964, and his reports. However, apparently, he never saw Dr. Kasselberg's last report of November 11, 1964, to the Social Security Administration, in which he stated appellant "was not able to return to work at present and I do not know if he will ever be able to return to his usual type of work." Moreover, Dr. Anderson did not know that finally Dr. Kasselberg and the physician of appellant's employer came to the conclusion that appellant was permanently and totally disabled.

It is true Dr. Kasselberg's three examinations during the various hospitalizations were somewhat different. He felt at first that the lumbar spine arthritic

condition improved on medication; that on the second hospitalization, the cervical and lumbar arthritis and radiculitis, from which appellant was suffering pain, gradually improved with traction, physiotherapy, cortisone preparations, and muscle relaxants, and there was an excellent prognosis for improvement; that on the third hospitalization appellant's back improved with the administration of Butisolidine Alka, and with a lumbosacral support, and that the prognosis as to a full recovery was limited, but as to the immediate future, it seemed to be satisfactory.

All of the foregoing reports of Dr. Kasselberg were optimistic and were characterized by different and additional treatment of appellant. But, in spite of these hopeful reports and after continuing various kinds of treatment over several months, Dr. Kasselberg came to the conclusion that appellant was permanently and totally disabled.

The fact that Dr. Kasselberg's reports gradually differed, from one hospitalization to succeeding hospitalizations and treatments, from hopeful prognoses to a final conclusion of complete disability seems rather the mark of a conscientious physician trying to do everything within his professional skill to remedy a disability, than of a physician who, it is implied, was inconsistent in his findings.

The examination of Dr. Anderson by the Hearing Examiner follows:

"Q. Referring to Dr. Hoover's statement or report of March 12, 1965, and you have a copy of it?

A. Yes, sir, I do.

Q. His impression was degenerative arthritis of the lumbar spine, mild, by history, relatively asymptomatic. What does he mean by that statement, in your opinion?

A. Degenerative arthritis is the wear and tear type of arthritis that we see in most individuals 40 or 50 years old or older.

Q. When one gets my age it ought to be pretty bad—65?

A. Yes, sir. I would say most people 65 years old have *some* degree of this condition. (Emphasis supplied.)

Q. Based on Dr. Hoover's entire report, do you agree with his interpretation of that arthritic condition as being mild, or not?"

It is quite obvious that this leading question was put to obtain an answer unfavorable to appellant. The answer was:

"A. Yes, sir I would agree with his opinion."

The witness, of course, had never examined appellant and was seeing him for the first time, while he was testifying. Continuing—

"Q. What does he mean by discogenic disease of the cervical spine, by history, relatively asymptomatic? First explain asymptomatic to me.

A. Asymptomatic means without symptoms.

Q. In other words, there are no symptoms there?

A. He uses the word 'relatively' asymptomatic, so I would think he meant with few symptoms.

Q. What does he mean by discogenic disease of the cervical spine? What is discogenic, in other words?

A. Yes, sir. Any disease relating to the disc or disc spaces; that is, the intervertebral disc spaces.

Q. And his third impression is surgical absence of the right upper lobe which by history is asymptomatic?

A. Yes, sir.

Q. That explains itself pretty well, doesn't it?

A. Yes, sir. The patient had a right upper lobe removed some years ago—I believe it was 1957.

Q. Apparently he doesn't have any symptoms relating to that condition?

A. Apparently so.

Q. Based on his report, do you agree with that?

A. Yes, sir."

It should be emphasized that practically all of the questions of the Hearing Examiner to the witness were based on Dr. Hoover's findings, which were, themselves, based on hearsay, since they referred to conditions "by history"—"degenerative arthritis of the lumbar spine mild, by history;" "discogenic disease of the cervical spine, by history;" and "by history" means by reference to the views or report of someone else. Dr. Hoover took no X rays of appellant's cervical and lumbar spine.

The examination of the witness up to this point sounds as though it were being conducted by an attorney opposed to appellant's claim, and availing himself of leading questions and hearsay to secure answers unfavorable to appellant.

The testimony of Dr. Anderson is based only on records of others, principally those of Dr. Hoover, and does not constitute substantial evidence that appellant could engage in substantial, gainful activity.

During his examination of appellant the Hearing Examiner found out that he was drawing a veteran's pension and disability pension from his employer for permanent and total disability:

"Q. I believe you did have some sort of disability pension from Armour and Company that you are drawing or did draw. Is that correct?

A. Retirement.

Q. How much did that amount to and are you still receiving that?

A. Well, it's $52 a month.

Q. Will you draw that, so far as you know, as long as you live?

A. I'm supposed to.

Q. You hope so, don't you? I guess Mr. McDougil hopes you do too. We are all working for that day. Does your wife work?

A. No, sir.

Q. Do you have any other income other than this $52 a month?

A. Insurance.

Q. How much is that?

A. $43 a month and $51 a month.

Q. From two different companies?

A. Yes.

Q. In other words, you are receiving a total, including retirement and two insurance companies, of approximately $150 a month? You get a veteran's pension of $77. You get a retirement of $52. You get pay from two insurance companies—one $43 and one $51. Is that correct?

A. Yes."

After appellant informed the Hearing Examiner that the doctor said he did not want appellant to do anything and that he had not been to the employment office to try and find some light work, because "the doctors told me not to try anything," the Hearing Examiner proceeded to embarrass and shame appellant.

"Q. Do you want any light work?

A. If I was able, I would."

Then, to show his contempt of appellant, the Hearing Examiner shot at him:

"Q. Or had you rather draw all these pensions and get your social security, *and lay around the house? Is that what you want to do?*" (Emphasis supplied.)

The humiliating language of the Hearing Examiner, if used by a trial judge in a case before a jury, would be considered evidence of such bias and prejudice that it would warrant a mistrial, or a reversal on appeal. It is no excuse that appellant was not represented by counsel. From the moment such language was indulged in by the Hearing Examiner, it was obvious that appellant was losing his case.

The above insinuating castigation of the witness is all the more strange, when we consider the evidence of what appellant's earnings were at the time he was removed to the hospital and lost his first day of work in thirty years because of his arthritic suffering. Appellant was no malingerer. He worked right up to the day he was hospitalized on June 6, 1964. For the year 1964, up to the time of his hospitalization, he had earned from Armour and Company, according to the earnings certification, a total of $2,701.06. Appellant was asked by the Hearing Examiner how much he was earning at the time of his hospitalization—"I don't want the exact penny. I just want to know in round numbers." Appellant answered: "$2.60 an hour."

On the basis of $2.60 an hour, appellant earned $20.80 a day on the basis of an eight-hour day. From January 1, 1964, to June 8, 1964, the day of appellant's hospitalization—he was paid, according to the Secretary's Exhibit No. 7 of appellant's "Earnings Certification," the sum of $2,701.06 for five months and eight days. For ten months and sixteen days, his income would have been double the amount stated, or $5,402.12. For the entire year of 1964, he would have been paid approximately $6,200. This would have been an increase of approximately $1,400 over his income for the prior year, of $4,800; but in 1959 his annual income from the same employer had increased six hundred dollars—from $4,200 to $4,800. Appellant was making much more money than he ever had, at the time he was hospitalized and his doctor told him he must not work anymore.

As a soldier disabled in active service in war, appellant's right to his veteran's pension of 50% disability had never been questioned by anyone, and had been paid to him and is being paid to him now, after these many years, as an obligation of a grateful country. It is difficult to understand how anyone could throw this up in his face to insinuate that his receiving of it could be the mark of an unworthy, lazy man, who would rather live on it than work—after his thirty years of labor in a heavy industrial job, hailed by his employer as "a very good employee," laboring all this time under such a disability. And the same applied to the slur cast upon him because he is receiving his retirement pension to which every employee of Armour is entitled, as well as the implied castigation of his receiving a pension from his employer after so many years of labor, when the physician for the company and the two insurance companies concerned agreed that he is entitled to a pension because of his pain, for total and permanent disability.

The Hearing Examiner was acting, in effect, as a trial judge as well as a cross-examiner. "An intimidating manner in putting questions may so coerce or disconcert the witness that his answers do not represent his actual knowledge on the subject. So also questions which in form or subject *cause embarrassment, shame or anger* in the witness may unfairly lead him to such demeanor and utterance that the impression produced by his statements does not do justice to his real testimonial value." Wigmore on Evidence, Section 781 (Third Edition).

The above-mentioned remark of the Hearing Examiner was followed by his statement appraising the evidence, before the hearing was concluded:

"Q. These doctors that made some X rays and don't find much wrong with you. It is these doctors that apparently don't know much about you that tell you not to work."

Dr. Kasselberg made his reports as a result of his examination of appellant and many X rays although he did not specify that he referred to them.

The Hearing Examiner's statement to appellant during his examination of him that "it is these doctors that don't know much about you that tell you not to work," was completely, unfounded and calculated to discourage appellant during the course of the examination. The doctor that told him not to work was his attending physician, Dr. Kasselberg, who had known about appellant for seventeen years, and had been treating him for his arthritis since he first knew him. He had been appellant's physician during appellant's many hospitalizations. No one giving medical evidence for the Government had ever treated him for his arthritis. Dr. Kasselberg was the only doctor who had ever prescribed medication for appellant's pain and inflammation, which appellant is still taking, and which no other doctors have criticized. No one giving medical evidence, except Dr. Kasselberg, had ever seen appellant during any of these hospitalizations. As to the Hearing Examiner's statement to appellant during the examination that "Dr. Kasselberg doesn't even report a severe condition," the report of Dr. Kasselberg was that appellant, on June 14, 1964, was suffering pain in the lumbar and cervical spine upon his admission to the hospital; that he had cervical and lumbar arthritis; that on July 1, appellant was readmitted to the hospital because of severe pain in his back and neck; that he was treated with traction, physiotherapy, and cortisone preparations, as well as with muscle relaxants, which brought about considerable improvement; that he had cervical and lumbar arthritis and radiculitis; that appellant was again admitted to the hospital on August 27, 1964, with his arthritic condition growing progressively worse—with radiation of pain down both sciatic nerves; that with several different kinds of medication and a lumbo-sacral sup-

port, his back improved; the sciatic nerve pain had almost completely disappeared; that he had hypertrophic arthritis of the lumbar spine; that on November 11, 1964, Dr. Kasselberg reported to the Social Security Administration that appellant, since being discharged from the hospital on September 6, 1964, had continued under his care; that his recovery had not been too satisfactory; and that he was unable to return to work.

Moreover, the evidence of appellant and I. L. McDougil, the Personnel Manager of appellant's employer, is undisputed that Dr. Kasselberg reported that appellant would never be able to return to work because of his condition; and that as a result of a conference between Dr. Kasselberg and the physician for Armour and Company, the company agreed that appellant was permanently and totally disabled, and was granted a pension for such permanent and total disability. All of the foregoing is the answer to the Hearing Examiner's statement that Dr. Kasselberg does not report a severe condition and "don't know much about you."

As to the X rays which the Hearing Examiner emphasized some of the Government medical witnesses had taken, while appellant's doctors, who told him not to work "don't know much about you," it appears from the report of Paul L. Lee, the Claims Representative of the Social Security Commission, that when appellant was admitted to St. Joseph Hospital in June 1964, at a time when Dr. Kasselberg was his attending physician, and the only physician who had examined him up to that time, many X rays were taken and a complete series of tests was made.

To the aforementioned question of the Hearing Examiner whether appellant would "rather draw all these pensions and get your social security and lay around the house? Is that what you want to do?" and to the statement of the Hearing Examiner that "it is these doctors that apparently don't know much

about you that tell you not to work," appellant replied:

"A. I hurt so bad I can't do nothing."

The Hearing Examiner continued:

"Q. Dr. Kasselberg doesn't even report a severe condition, as you know, and the other two doctors —they don't think there is much wrong with you.

A. Like I tell you, I can't stand on my feet no time. I can't sit very long."

To this answer, the Hearing Examiner again embarrassed and shamed appellant by repeating:

"Q. Do you want to go back to work?

A. Yes, sir.

Q. *Or would you rather draw these pensions and stay at home?*

A. As I told you, I had rather go to to work than sit around.

Q. *Are you serious about that?*

A. That's right. I rather work than sit around." (Emphasis supplied.)

All of this badgering was preparatory to urging and leading the witness into saying he could perform jobs that he did not know anything about, and concerning which no vocational counselor, or anyone else, testified or described any specifications therefor.

The Hearing Examiner continued:

"Q. Could you put carburetors together that weigh no more than a few pounds?

A. That's right, but like I say, if I sit too long I go to hurting. If I stand too long— * * *

Q. Could you sit where you are now, and assemble flashlights, for instance? You know there is nothing to assembling flashlights.

A. For so long at a time—I'm sitting here now with my legs and hips bursting.

Q. They are going to burst wherever you are, aren't they?

A. I've got to change around."

There is no evidence that there is any substantial gainful occupation as a job putting "carburetors together that weigh no more than a few pounds." Nor is there any evidence that there is any *substantial gainful occupation* of assembling flashlights—which the Hearing Examiner himself said "there is nothing to assembling flashlights."

The Hearing Examiner continued:

"Q. Why couldn't you candle eggs if you had a job like that? * * * All you have to do is pick up nothing heavier than an egg and look at it toward a strong light. Why couldn't you do that if you had a job like that?

A. I could. Like I say, when I sit so long my legs just burst. I get up and walk around a little and it eases.

Q. Candling eggs, as you know, you can either sit or stand. You don't have to sit all the time.

A. I have never done any of that."

There is no evidence that candling eggs constitutes substantial gainful activity. "It is not necessary that plaintiff be bed-ridden to come within the statute's provisions. Neither is she required to try to sell apples. She is not required to meet every remote possibility which may be conjured up." Burrell v. Finch, 308 F.Supp. 264 (D.C.Kan.) However, a bed-ridden person could hold an egg up to a strong light, and look at it to see whether it seemed clear or cloudy. There is no evidence that candling eggs by a bed-ridden person, or by one suffering from arthritis, or by anyone else, constitutes substantial gainful activity.

The Hearing Examiner continued:

"Q. That is a ball point pen. There are five or six parts to it. If you had a job putting that together, is there any reason why you couldn't do it?

A. If I could move around."

The following answers were made by appellant to questions asked by the Hearing Examiner: "I hurt so bad I can't do nothing. The doctor said he didn't want

me to do anything. If I could I would work * * *. I can't stand on my feet no time. I can't sit very long. * * * if I sit too long I go to hurting. * * * I'm sitting here now with my legs and hips bursting—I've got to change around. * * * When I sit so long my legs just burst." How, then, did the Hearing Examiner get the appellant to admit he could do something in spite of his foregoing testimony, none of which was questioned by any medical witness as to his only being able to stand a little while, and then sit a little while, and keep changing about—all of which was supported by the evidence of Dr. Kasselberg, Dr. Myhr and others? No one has cast any doubt on appellant's testimony as to the excruciating pain in his hips and in his legs. The Hearing Examiner proceeded after his badgering, and statement that appellant's doctors didn't know much about him, by suggesting that he could do jobs *where he "could either stand up or sit down"*—which was certainly enough to confuse appellant into answering that he could do such jobs, on the assumption, perhaps, that "where he could either stand up or sit down" meant jobs where "he couldn't stand on my feet no time," and "I can't sit very long." If a job only required a person who could either stand up or sit down, it would not be available to a person who could neither "stand on my feet no time. I can't sit very long * * * if I sit too long, I go to hurting."

Nevertheless, appellant was led by the Hearing Examiner by such questions as: "Why couldn't you candle eggs? If you had a job putting parts of a ball point pen together, is there any reason why you couldn't do that? Could you assemble flashlights? * * * You know there is nothing to assembling flashlights," and, finally, the Hearing Examiner got to the question whether he couldn't operate an elevator where you can either stand up or sit down?—and a variety of other jobs, never taking into consideration that appellant said, because of his pain, he could stand only for a brief time, or sit for a brief time before it be-

came too painful for him—all of which was supported by his unquestioned statement to Mr. Lee, the Claims Representative of the Social Security Administration, and to Dr. Horton, the witness before the Appeals Council, who reported that appellant told him, at the beginning of his single examination of him: "My hips ache and hurt all the time. I have to change my position all the time, it seems like the bones just throb from my hips to my knees." Dr. Hoover, also of the Administration, said that "this * * * pain seems to be pain that envelops the hips, thighs and lower legs as that associated with muscle tenderness." Appellant's hip and leg pain was not questioned in any medical evidence.

This is too facile and improper a way to insinuate that a disability claimant could engage in substantial gainful activity by holding a ball-point pen in one's hand and asking the claimant whether there was any reason he couldn't put five small parts together! This was something a bedridden person could also do. Is that substantial gainful activity? There is no evidence that it is. No one testified that it was a job that offered substantial gainful employment. However, after getting "yes" answers from appellant as to ability to put light-weight carburetors together, assembling flashlights,—since, as the Hearing Examiner stated, there is nothing to assembling flashlights, candling eggs, putting small parts of a ball point pen together—the Hearing Examiner proceeded to heavier work:

"Q. Is there any reason why you couldn't operate an elevator where you can either stand up or sit down?

A. No, sir.

Q. You could do that, couldn't you?

A. Yes, sir."

Appellant had no experience in operating an elevator. None of the work he had ever done was remotely similar to being an elevator operator. He did not know what was required. Apparently, he knew what anyone, including a child,

knows about operating a non-automatic elevator—that one presses a lever, in one way to make it go up, and in another, to make it go down, and places it in a neutral position to make it stop. Appellant could have as well been asked why he could not operate a diesel locomotive, which requires only moving a lever to make it go, and moving another lever to operate the brakes, and like motions for whistle and bell. But commencing by being badgered about whether he would "rather draw his pensions, and get social security," "and lay around the house" rather than work, and that it was only doctors who didn't know much about him, that told him he could not work, he was induced by leading questions into saying he could candle eggs, assemble flashlights, assemble small parts of a ball-point pen, operate an elevator and, finally, into putting cigars into a box, packing the box for shipment, wrapping fruit in tissue paper, putting it in a box, crating it for shipment, doing the same with potatoes and beans, "move about, handle objects, see, hear, speak, and understand"—"all except heavy things," "ten or twenty pounds."

Without the knowledge of any job specifications, anyone could be said to be able to do almost anything, except lift and carry objects of great weight.

All of the questions put to appellant by the Hearing Examiner were leading questions, calling for the conclusions of the appellant,—"You could do that, couldn't you?"—and the conclusions were extracted from him without any statement of specifications for the particular job, and only after he had been humiliated by being asked whether he would rather draw his pensions and benefits, and just lay around the house, and after the Hearing Examiner had told him the doctors who told him not to work didn't know much about him; and that his own attending physician for seventeen years did not think he had a severe condition. Appellant was badgered into statements unintended by him that he really could perform duties that his pain prevented him from performing, because he had to change his position from sitting to standing, to lying down, to relieve himself of the constant pain.

A witness must always be protected "against being badgered or tricked into statements unintended by the witness." People v. Southack, 39 Cal.2d 578, 248 P. 2d 12.

The court has determined that any such statements of appellant, as admissions, are not to be considered as evidence in this case.

As to his pain, appellant's own testimony and statements as to constant pain in his hips and legs are not questioned by anyone, even the physicians employed by the Social Security Administration.

When appellant was asked by the Hearing Examiner whether he could lift a twenty-five pound sack of flour and carry it, he replied: "When I pick it up, a pain grabs in each hip * * *."

In further testimony, when asked by the Hearing Examiner where his arthritis affected him most, his answer was: "Right between my hips and in the hips. * * * It started in my neck * * * I had it in my hips when I went to the Army. * * * [I have arthritis] more or less in all my joints. * * * [it is worse] in my back and hips. I'm sitting here now with my legs and hips bursting."

Appellant's wife testified that he complained most of "his back and legs and arms."

In the first "Report of Contact," on November 3, 1964, Mr. Lee, the Claims Representative, stated of appellant: "He says his legs hurt if he stands a while, and his hips hurt after sitting awhile * * *. He seemed uncomfortable and rubbed his thighs. He said his legs were paining him. * * * He seemed to wobble as if his legs would give way."

In the report of Dr. Horton, the witness of the Social Security Administration, before the Appeals Council, he related of appellant that he stated: "My hips ache and hurt all the time. I have to change my position all the time. It seems like the bones just throb from my

hips to my knees." In the report of Dr. Hoover regarding appellant, he states: "Standing for more than a few minutes is said to cause pain in the legs. This is not a sciatic-type pain, nor is it any radiation of pain from the back area, but seems to be pain that envelops the hips, thighs and lower legs as that associated with muscle tenderness." Dr. Hoover went on: "[M]usculoskeletal examination did not reveal any abnormality of the joints or muscles." Dr. Hoover, as above mentioned, took no X rays or did he see any musculoskeletal X rays of appellant. He further stated: "When attention is directed to the back and leg areas, the patient quite obviously gives false responses in straight leg raising and Patrick Hip tests examination." However, Dr. Whittemore, also representing the Social Security Administration, reported: "Concerning the lower back, there is some degree of degenerative joint disease which is mildly advanced. His pain appears localized in the lumbarsacral area * * *. Lumbar spine * * * shows mild degenerative reaction, L-2-3-4. Interspaces, however, are well maintained." Dr. Ray, however, after stating that the lumbar spaces are well preserved, reported: "There is very slight narrowing of the third lumbar interspace, and some narrowing of the first lumbar interspace with mild hypertrophic changes thereabouts," and the diagnosis was "hypertrophic arthritis, lumbar regions, mild."

With regard to the findings of the Social Security Administration physician, that in certain tests appellant did not complain of pain expected from his claimed disabled condition, none of them took into account the fact that every three weeks, he received injections from Dr. Kasselberg; and that he was taking four pain-killing tablets a day, prescribed by Dr. Kasselberg, as well as four to eight aspirins a day.

Dr. Myhr, as above mentioned, whose evidence was presented to the Appeals Council after the Hearing Examiner's decision, reported after recounting his physical examination of appellant and referring to the X rays he had taken, "this man is unable to work—* * * at this time * * * because of his cervical disc syndrome which is causing him considerable pain and also because of lumbar spine arthritis." In this, Dr. Myhr confirmed Dr. Kasselberg, appellant's attending physician.

Great difficulties are presented in the review of many Social Security cases.

"The review of cases for disability benefits under the Social Security Act is onerous from many aspects. The case before the Hearing Examiner is heard informally. This means that there is practically no examination or cross-examination of any witnesses, except the claimant himself, usually a man whose life has been one of hard labor, and with little education; and, sometimes, a Vocational Counselor. The record, for the most part, consists of letters and written statements regarding the disability claimed, the extent of it, or the lack of it. Many of these statements consist of official printed forms of applications and reports filled in, in the handwriting of various individuals; and their reproduction in the record often requires laborious decipherment. These records call for searching investigation by the district courts, and further searching investigation by appellate courts." Miracle v. Celebrezze, 351 F.2d 361, 382 (C.A.6)

"[I]t is the duty of courts to examine meticulously the evidence, no matter how burdensome that duty is, because of the helter-skelter nature of the records in these cases, and not adopt the facile way of disposing of an injured applicant's case by reference to, and reliance upon, the statements of one or two physicians, as against the considered statements of many physicians and surgeons who have had more opportunity of examining and treating the applicant, more occasions of making medical reports upon him, and more expertness in diagnosis, as well as upon consideration of the facts reflected in the transcript

as a whole." Mefford v. Gardner, 383 F.2d 748, 761 (C.A.6).

These cases involving disability would be easier to review if Hearing Examiners and counsel for the Social Security Administration were more accurate in their statements regarding crucial aspects of the evidence.

In their brief, counsel for appellee states:

"After the hearing examiner's decision, claimant requested review before the Appeals Council. In support thereof, he submitted a report from a Dr. Lamb B. Myhr, Jackson Clinic, Jackson, Tennessee. The report revealed the existence of spondylosis of the spine, and, although no clinical findings were set out, it also concluded that claimant was suffering from pulmonary emphysema."

The above is entirely misleading. No clinical findings were set out because Dr. Myhr's report of pulmonary emphysema was stated to be taken from a history from some other doctor. The actual fact is that Dr. Myhr reported: "Pulmonary emphysema and fibrosis *from history.*" (Emphasis supplied.) The "history" was from Dr. Hoover's report for the Social Security Administration after taking X rays of appellant's chest, in which Dr. Hoover stated:

"There are areas of increased linear markings and strand densities in the right lower lung and right mid-lung field suggestive of some emphysematous changes. * * * Interpretation: Minimal localized emphysematous changes in the right middle and lower lobes, otherwise normal PA Chest X-Ray."

It should be pointed out that Dr. Horton also took X rays of appellant's chest but reported no evidence of any emphysematous changes, resulting in the fact that there was dissimilarity in the reports of the two Social Security Administration physicians who made an X-ray examination of appellant's chest.

Moreover, the Hearing Examiner, in his decision, said that Dr. Ray stated of appellant: "I do not consider him * * disabled." The actual statement of Dr. Ray was: "I do not consider him sufficiently disabled to justify the granting of Social Security benefits." He did not pretend to state what would justify the granting of Social Security benefits, or that appellant was disabled from engaging in substantial gainful activity.

Here it should be emphasized that during the hearing before the Hearing Examiner, *appellant was an uneducated man,* who was not represented by counsel. According to the evidence, he stated that Dr. Kasselberg had told him he could not work any more after his repeated hospitalizations in June, 1964. Appellant also had stated, according to the Government witness, Dr. Hoover, that Dr. Ted Galyon, an orthopedist, and Dr. Peter Wallace, a neuro-surgeon, "said he could not work." In addition, it appeared, as above mentioned, from the evidence of the Personnel Manager of Armour and Company, appellant's employer, that Dr. Kasselberg had held a consultation with the physician of the employer, and that they both agreed that the company should grant appellant permanent and total disability benefits because of his arthritic condition, a conclusion which was agreed to by the company and the two insurers involved, with the result that appellant was granted a pension for permanent and total disability.

Although the Hearing Examiner called Dr. Anderson, a witness adverse to claimant, who testified only as to the adverse opinions of the Social Security Administration physicians opposing appellant's claim, the Hearing Examiner never called Dr. Kasselberg, Dr. Galyon, Dr. Wallace, or the physician for appellant's employer, and disregarded everything they said and concluded concerning appellant's disability, without ever interrogating them. For a Hearing Examiner to go out of the way to call a medical witness to testify, merely to give an opinion adverse to appellant, solely on the basis of other reports adverse to appellant by physicians for the appellee, and never to call any of the physicians that reported and con-

cluded that appellant was permanently and totally disabled, seems passing strange procedure in a case in which appellant was not represented by counsel.

Not only is it passing strange procedure, but where an applicant is not represented by counsel, a duty devolves upon the Hearing Examiner to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts surrounding the alleged claim of right or privilege, and, in such a case where the applicant should be questioned more thoroughly concerning his arthritic condition, and more comprehensive medical evidence is available to the Examiner, his failure to adequately explore the facts surrounding applicant's claim is an abuse of discretion. Hennig v. Gardner, 276 F.Supp. 622 (1967) (N.D.Texas, Dallas Division).[3]

In Stewart v. Cohen, 309 F.Supp. 949 (E.D.N.Y.1970), Judge Judd, in his opinion, declared:

"It is still true that the Social Security Act is a remedial statute, to be broadly considered and liberally applied. Haberman v. Finch, 418 F.2d 664 (C.A.2). * * *

"When an individual appears without an attorney, the hearing examiner has a duty not to be a mere umpire, but to see that all relevant facts are developed. Coyle v. Gardner, 298 F. Supp. 609 (D.Hawaii 1969); Hennig v. Gardner, 276 F.Supp. 622, 625 (N. D.Texas 1967) (treating failure to explore the facts adequately as an abuse of discretion)".

In the light of the foregoing cases, the Examiner's failure adequately to explore the facts surrounding appellant's claim

3. In the Hennig case, Judge William M. Taylor said:

"Administrative hearings under the Social Security Act are not adversary proceedings. Ihnen v. Celebrezze, D.S.D., 1963, 223 F.Supp. 157; Blanscet v. Ribicoff, W.D.Ark., 1962, 201 F.Supp. 257, and representation by counsel is not a requisite to insure ultimate fairness in the proceedings. However, in administrative proceedings in which rights and privileges are in issue and the guiding hand of counsel is not present to advocate their existence, a duty devolves on the hearing examiner to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts surrounding the alleged claim of right or privilege. The hearing examiner is entrusted with a broad discretion in the conduct of the administrative hearing and a failure of the hearing to produce a full airing of the facts in issue may well be attributed to an abuse of that discretion.

"As stated by Judge Brown in Butler v. Flemming, supra [5 Cir., 288 F.2d 591], 'satisfaction of the claimant's statutory obligation is to be judged in a practical way.' 288 F.2d at 595. Most certainly, one of the overriding practical considerations in this judgment is the ability of the claimant to present his case to the examiner. Some individuals do not possess the gift of self-expression and persuasion. Nerv-

ous tension, fear and anxiety are only some of the attending circumstances which may concur to render a claimant's presentation of his cause inept.

"In the instant case, Mrs. Hennig is seen to be a middle-aged woman with a ninth grade education. Her husband is a construction-laborer. She spent the greater part of her working years as a sewing machine operator and possessed no talents other than sewing. The record amply reflects her inability to present both herself and her cause. As a result, the evidence is nebulous and incomplete as to the period between December, 1961 and March, 1964. More comprehensive medical evidence was available to the examiner; he has the power to issue subpoenas. Mrs. Hennig should have been questioned more thoroughly by the examiner concerning her arthritic condition, thereby more fully portraying the facts of her contentions.

"For these reasons the failure of the examiner to adequately explore the facts surrounding Mrs. Hennig's claim was an abuse of his discretion. The examiner, although an employee of the federal government, does not hold a position of partisanship. If the facts which would entitle the claimant to relief are ascertainable, the examiner has a duty to seek them out, notwithstanding the claimant's failure on his own initiative to do so; the interests of justice so require."

resulted in an abuse of discretion, when appellant was without counsel, and the only alleged facts developed by the Examiner were conclusions of witnesses adverse to his claim, while appellant himself was subjected to a rigorous cross-examination by the Examiner in a manner to embarrass and shame appellant, while telling him that his own doctor knew little about him, and the doctors that really knew, considered there was nothing the matter with him.

We are of the view that appellant established a *prima facie* case of permanent and total disability by substantial evidence that proved he could not engage in substantial gainful activity. Such *prima facie* disability was proved by the reports of Dr. Kasselberg and his statement that appellant would never be able to return to work because of his back condition. For the basis of this conclusion he had the experience of treating appellant for seventeen years, specifically, for cervical and lumbar arthritic pains. Appellant had many X rays taken in the hospital, as Mr. Paul L. Lee, the Claims Representative of the Social Security Administration, stated. He had a complete round of tests; and Dr. Kasselberg was the only one who had seen, examined, and treated appellant during his eight different hospitalizations—all in St. Joseph Hospital. Dr. Kasselberg treated appellant with "shots" and drugs in pill form for his arthritic pain, as well as with anti-inflammatous drugs. Moreover, there was the testimony of appellant and of his wife in support of his claim.

We come then to the application of the standard for disability from pain adopted by the Hearing Examiner, as well as by the Appeals Council and the district court, and we hold that the fact findings of the Hearing Examiner are unacceptable and erroneous, since they are based on incorrect legal standards.

Running through the whole concept of the substantial evidence test in respect to reviewing findings of the Secretary with regard to social security matters as a principal thread, is the idea that fact findings are acceptable only where it is evident that the correct legal standard has been employed by the Hearing Examiner. Colegate v. Gardner, 265 F. Supp. 987 (1967) (S.D.Ohio, W.D.); Henderson v. Flemming, 283 F.2d 882 (C.A.5).

In Branham v. Gardner, 383 F.2d 614, 626, 627 (C.A.6), this court said:

"The rule governing these cases has been clearly set forth in Ferran v. Flemming, 293 F.2d 568, 571 (C.A.5), where the court stated:

" 'Our review is ordinarily, of course, limited to determining merely whether there is substantial evidence to support the administrative findings. But here, just as in the "clearly erroneous" review of a judge's findings, *when the fact-finder has failed to employ the proper legal standard in making its determination the finding may not stand.* Mitchell v. Mitchell Truck Lines, 5 Cir., 1961, 286 F.2d 721; Henderson and Poole v. Flemming, 5 Cir., 1960, 283 F.2d 882; United States v. Williamson, 5 Cir., 1958, 255 F.2d 512; Mitchell v. Raines, 5 Cir., 1956, 238 F.2d 186. *The facts must be evaluated by the administrator in the light of correct legal standards to entitle the administrative findings to the insulation of the substantial evidence test.'* (Emphasis supplied.)"

In the first place, in deciding this case, the court said that "while claimant may suffer some while engaging in physical activities * * * it is well known that many people engage in many trades, businesses and professions while suffering more or less constant pain." In two different places in his opinion, the Hearing Examiner referred to and relied upon the case of Theberge v. United States, 87 F.2d 697 (C.A.2).

In Theberge v. United States, *supra,* the court stated:

"A man may have to endure discomfort or pain and not be totally disabled; much of the best work of life goes on under such disabilities; * *.

The only work available to the insured must do more than hurt, it must substantially aggravate his malady."

This was an incorrect and erroneous standard used by the Hearing Examiner for the consideration of pain as a disability.

In Sayers v. Gardner, 380 F.2d 940, 947 (C.A.6), decided July 14, 1967, this court quoted the above language from Theberge, and stated:

"This rule has been specifically discredited, in these disability cases, by this court on so many occasions that *it would appear that the Hearing Examiners are resolved to decide these cases, involving pain, on grounds directly contrary to the decisions of this court and the many other adjudications of the federal courts in these disability cases.* (Emphasis supplied.)

"As an instance, in the case of Polly v. Gardner, Secretary, 364 F.2d 969, 972, 973 (C.A.6), this court said:

" 'Furthermore, the Hearing Examiner based his decision on an additional erroneous conception of the law which has been repeatedly pointed out by this court, in the reversal of many of these disability benefit cases. The Hearing Examiner, in his decision, relied upon * * * Theberge v. United States, 87 F.2d 697 (C.A.2) * * *.

" 'On countless occasions, we have refused to consider the *Theberge* case as of any authority or consequence, and have expressly declared that we would not follow it.

" 'In Miracle v. Celebrezze, 351 F. 2d 361 (C.A.6), this court held:

" ' "This case starts out with a primary reversible error to the disadvantage of a poverty-stricken man suffering from pain incurred during a lifetime of hard labor. The keystone of the decision by the Hearing Examiner, which was adopted by the Secretary of Health, Education and Welfare and which constitutes the basis of the judgment from which appeal is taken, states:

" ' " "Granting that the claimant has experienced some pain, the fact that an individual is unable to work without some pain and discomfort does not justify a finding of disability. In Theberge v. United States [2 Cir.] 87 F.2d 697, Judge Learned Hand stated: "A man may have to endure discomfort or pain and not be totally disabled; much of the best work of life goes on under such disabilities. The only work available to the insured must do more than hurt, it must substantially aggravate his malady." '

\* \* \* \* \* \*

" ' "This court has repeatedly held that it will not follow the holding in Theberge v. United States, 2 Cir., 87 F.2d 697, but that, rather, we follow the holding and notable decision in Butler v. Flemming, 288 F.2d 591, 595 (C.A.5), in which Judge Brown, speaking for the court, said:

" ' " 'If, as suggested in the Government's brief, Hallard v. Fleming, D.C.W.D.Ark., 1958, 167 F.Supp. 205, and Judge Learned Hand's statements in Theberge v. United States, 2 Cir., 1937, 87 F.2d 697, 698, concerning a different statute enacted for a different policy in a different era, are to stand for the proposition that pain, no matter how severe, is not disabling unless work does "more than hurt" so that it "substantially aggravate[s] his malady," 87 F.2d at page 698, we regard them as contrary to the standard announced in Booker and Kerner and many others like them. Perhaps it is true that history teaches that "A man may have to endure discomfort or pain and not be totally disabled; much of the best work of life goes on under such disabilities; \* \* \*, *But the purpose of much social security legislation is to ameliorate some of these rigors that life imposes.* Congress has in effect stated that if a person is unable except under great pain to engage in any substantial gainful activity in which he

might be employable, taking into consideration his age, training, work experience and physical and mental capacities, he shall be deemed to be disabled for the purposes of this Act." ' (Emphasis supplied.)

"In Henninger v. Celebrezze, 6 Cir., 349 F.2d 808, 814, this court held that it would not follow the rule in Theberge v. United States, 2 Cir., 87 F.2d 697, on pain, which the Hearing Examiner followed in this case, but would rather follow the notable opinion of Judge Brown in Butler v. Flemming, 288 F.2d 591, 595 (C.A.5).

"In Massey v. Celebrezze, 345 F.2d 146 (C.A.6), this court again repeated that the standard in the *Theberge* case, relied upon by the Hearing Examiner, in the instant case, was contrary to the proper standard of disability resulting from pain, and that a decision based thereon resulted in reversible error. All of the foregoing cases are in keeping with the authorities of the federal courts in like adjudications.

"If a person is unable except under great pain to engage in any substantial gainful activity in which he might be employable, taking into consideration his age, training, work experience and physical and mental capacities, he is deemed disabled for purposes of the Social Security Act. Smith v. Celebrezze, 229 F.Supp. 827 (D.C.N.C.). Even pain unaccompanied by any objectively observable symptoms, which is nevertheless real to the sufferer and so intense as to be disabling, will support a claim for disability benefits. Ber v. Celebrezze, 332 F.2d 293 (C.A. 2). The fact that there is such a subjective symptom as pain of claimant for social security benefits does not mean that it ranks as a lesser type of disability. Blanscet v. Ribicoff, 201 F.Supp. 257 (D.C.Ark.). The motion that pain must be endured, that pain, no matter how severe or overpowering, is not disabling unless it will substantially aggravate a condition, is contrary to law under disability provisions of the Social Security Act which were

intended to ameliorate some of the rigors that life imposes. Page v. Celebrezze, 311 F.2d 757 (C.A.5) * * *.

"In Drafts v. Celebrezze, D.C., 240 F.Supp. 535, 538, the court said:

" 'Pain was brushed aside as a subjective non-entity. Well reasoned opinions and the obvious purposes of the Act compel that great consideration be accorded to that merciless entity called "pain." The fact that some extraordinary individuals can bear it and perform unflinchingly does not mean that such heroics is the "standard." The criterion is not even the standard of the ordinary man or the average man; the standard is the individual claimant himself, with all his personal assets and liabilities.'

"The Hearing Examiner in this case, whose decision was affirmed by the Appeals Council and the District Court, was guilty of reversible error in holding that pain, in itself, was not enough to constitute a disabling impairment, and that the pain which appellant suffered must do more than hurt, and in order to be considered disabling, must substantially aggravate the malady. This holding, which, as we have remarked, has been held to be reversible error is so many of the cases decided by this court during the past several years, always appears in the decisions of the Hearing Examiners involving pain which is claimed to be disabling; and, since we have never been asked by the Secretary to overrule our repeated decisions on the subject, the reason for such holdings eludes our speculation. *All that this kind of thing does is pile up tremendous records, on appeal, that, in spite of reversible error, must be meticulously examined by already overburdened courts to ensure a just and legal determination of an applicant's rights.*" (Emphasis supplied.)

Moreover, the Hearing Examiner was in error in holding that the term "disability" must be strictly construed or, as he stated, "construed as being very con-

servative. \* \* \* It is clear to the hearing examiner that Congress intended to set up and establish a conservative program for disability benefits when it passed the disability provisions of the Act, and many courts have sustained this construction of the Act." Among the cases cited by the Hearing Examiner for the above proposition are Theberge v. United States, supra, which we have already discussed, Adams v. Flemming, 276 F.2d 901 (C.A.2), and Hallard v. Fleming, 167 F.Supp. 205 (W.D.Ark.).

With regard to Adams v. Flemming, supra, cited by the Hearing Examiner, the court in Hayes v. Celebrezze, 311 F. 2d 648, 651, 652 (C.A.5), said:

"The Secretary persists in the notion that no matter how painful in fact this must be, it does not satisfy the statute since this is one of life's burdens. Supporting this the brief lays stress on the words from Adams v. Flemming, 2 Cir., 1960, 276 F.2d 901, 904, that 'Judicial notice can be taken of the fact that \* \* \*. There are undoubtedly millions of people suffering daily from some infirmity; \* \* \* those whose arthritic and rheumatic symptoms flare up and subside; \* \* \* and those who suffer from various spinal ailments and discomforts.' Responding to a like argument, this Court in Butler v. Flemming, 5 Cir., 1961, 288 F.2d 591, 595, in the plainest of terms rejected as out of keeping with legislation whose ' \* \* \* purpose \* \* \* is to ameliorate some of these rigors that life imposes,' the ideas once expressed by Judge Hand in Theberge v. United States, 2 Cir., 1937, 87 F.2d 697, 698."

In Hallard v. Fleming, supra, also cited by the Hearing Examiner in support of his findings, this court followed, as appears above, the notable decision in Butler v. Flemming, 288 F.2d 591 (C.A.5), in which Judge Brown, speaking for the court, referring to the Hallard case, likened it to the announcement of the same rule declared in Theberge, and stated that "we regard them as contrary to the standard announced in Booker [Flem-

ming v. Booker, 5 Cir., 283 F.2d 321] and Kerner [Kerner v. Flemming, 2 Cir., 283 F.2d 916] and many others like them"; and held that Hallard was erroneous as an authority; and this court, as heretofore noted, followed the holding in Butler v. Flemming, supra.

As was held in Flake v. Gardner, 399 F.2d 532 (C.A.9), even though the findings of the Secretary be supported by substantial evidence, the decision should be set aside if proper legal standards were not applied in weighing the evidence and making the decision.

Inasmuch as the findings of the Administrator in social security cases carry an awesome weight, it is essential that proper legal standards be employed in the appraisal of the evidence. Dodsworth v. Celebrezze, 349 F.2d 312 (C.A.5).

In using the standard of pain set forth in Theberge v. United States, supra, and assuming that many people must engage in many trades, businesses, and professions while suffering more or less constant pain, or be precluded from the right to receive disability benefits, the Hearing Examiner erred to the prejudice of appellant in this most important aspect of the case.

The Hearing Examiner erred further in employing the erroneous legal standard in his construction of the Act relating to disability, by holding that the term "disability" has been construed as very conservative, and that "Congress intended to set up and establish a conservative program for disability benefits." Obviously, the Hearing Examiner used the term "construed as very conservative" as equivalent to "strictly construed," as opposed to being liberally construed.

The Act is to be liberally construed, and not strictly or conservatively construed. As far back as 1953 it was stated in 81 C.J.S. Social Security and Public Welfare §§ 2, 3 and 4, that the "act was adopted pursuant to a public policy unknown to the common law, designed for the protection of society, and enacted to alleviate the burdens which rest on large numbers of the population because of the

insecurities of modern life * * *. The * * * Act, being remedial in scope, should be liberally and reasonably construed so as to effectuate its objectives * * *. [A]ll doubt in construing the act * * * should favor coverage rather than exemption."

In Polly v. Gardner, 364 F.2d 969, 974, 975 (C.A.6) this court said:

"In this case, the objective of the Secretary appears to be to secure a strict, as opposed to a liberal, construction of the Social Security Act with regard to disability benefits. In fact, in his decision, the Hearing Examiner stated that 'we conclude that Congress intended a strict construction of the disability provisions of the act.' This is contrary to our view that the statute should be liberally construed in favor of disability; and this view is supported by numerous authorities.

\*    \*    \*    \*    \*    \*

" *The broad purposes of the Act require a liberal construction in favor of disability* if same is reasonably made out. Bagwell v. Celebrezze, 232 F.Supp. 989 (W.D.S.C. 1964). The intent is inclusion rather than exclusion. Miles v. Celebrezze, 233 F.Supp. 767, 770–771 (W.D.S.C.1964).' (Emphasis supplied.)

"In Smith v. Gardner, 251 F.Supp. 262, 268 (M.D.N.C.1966), Judge Gordon, in reversing the decision of the Secretary and remanding the case with directions to grant disability benefits, said:

" 'Thus, the medical evidence, the subjective evidence of disability, the corroborating evidence of the plaintiff's spouse, the work history of the plaintiff, and the evidence furnished by her employer all show *nemine contradicente* that the plaintiff is unable to engage in a substantial gainful activity. Considering the evidence whereon it would have been possible for the Hearing Examiner to have based his decision— there is none.

" 'Although the courts are not to interpret the Social Security Act so broadly as to equate it with unemployment compensation, Celebrezze v. Sutton, 8 Cir., 338 F.2d 417, 422 (1964); Richard v. Celebrezze, 247 F.Supp. 183, 185 (D.Minn.1965), *the Act is nevertheless to be construed liberally,* Bradey v. Ribicoff, 4 Cir., 298 F.2d 855 (1962), cert. den. 370 U.S. 951, 82 S.Ct. 1601, 8 L.Ed.2d 817 (1962), cert. den., sub nom. Heath et al. v. Celebrezze, 372 U.S. 945, 83 S.Ct. 938, 9 L.Ed.2d 970 (1963); Celebrezze v. Bolas, 8 Cir., 316 F.2d 498, 500 (1963); Rodriguez v. Celebrezze, 1 Cir., 349 F.2d 494; De Gracia v. Secretary of Health, Education and Welfare, 248 F.Supp. 522 (D.P.R.1966).' (Emphasis supplied.)"

"In Amick v. Celebrezze, 253 F.Supp. 192, 195 (D.C.S.C.1966), Judge Dalton, in reversing the decision of the Secretary and remanding the case with directions to allow disability benefits to the applicant, said:

" 'It is evident that the claimant need not be completely helpless or bedridden to fall within the purview of the Act. Likewise, she need not go down a list of all conceivable occupations and verbally negate her capacity for each of them or her opportunity for employment. *"Any substantial gainful activity"* is to be read in the light of what is reasonable and not what is conceivable. Thomas v. Celebrezze, supra [331 F.2d 541 (4th Cir. 1964)]; Jarvis v. Ribicoff, 312 F.2d 707 (6th Cir. 1963). Along these same lines, plaintiff is not prejudiced by reason of the fact that she has not taken to selling apples or pencils on a street corner. "It is no answer that the claimant may be theoretically capable of performing some one of the 'non-physical, observational' jobs contained in an exhaustive list covering places and circumstances utterly irrelevant to her situation." ' Thom-

as v. Celebrezze, supra, 331 F.2d at 546."

Speaking for the court in Walston v. Gardner, 381 F.2d 580, 585 (C.A.6), Judge Cecil declared: "The Social Security Act is remedial in nature, seeking to provide assistance to those who are medically unable to secure employment, and is to be construed liberally."

As stated in Miles v. Celebrezze, 233 F.Supp. 767, 770, 771 (W.D.S.C.), laws, such as the Social Security Act, "intend and purpose *inclusion rather than exclusion.*" Where the question is a close one, the doubt should be liberally construed in favor of the social security claimant. Carroll v. Social Security Board, 128 F.2d 876 (C.A.7).

Concerning appellant's disability, the Hearing Examiner acknowledged:

"It may be that claimant has not been able to carry on his usual work in his usual manner, but it has not been established by the evidence that he has been unable to engage in any substantial gainful activity, particularly light or sedentary work. The evidence seems to show that claimant still has the residual capacity *for moving about, handling objects, hearing, seeing, and speaking, as well as understanding and reasoning,* which would indicate that claimant is able to engage in many normal activities. Perhaps claimant may suffer some while engaging in physical activities; * * *." (Emphasis supplied.)

In holding that *"it has not been established by the evidence that he is unable to engage in any substantial gainful activity,"* the burden is not upon the appellant to establish that, even though he cannot carry on his usual work, *he can nevertheless engage in some substantial gainful activity.*

The burden of showing that appellant can engage in some substantial gainful activity is on the appellee Secretary; there is no burden on appellant to show he is unable to engage in any substantial gainful activity; and there is no finding that the evidence shows that appellant has the "residual capacity" to engage in any substantial gainful activity.

Evidence, as recited by the Hearing Examiner, that appellant "has the residual capacity for moving about, handling objects, hearing, seeing, and speaking, as well as understanding, and reasoning"—is no evidence that appellant could engage in substantial gainful employment.

It is to be noted that the Hearing Examiner in his decision stated: "It *may* be that claimant has not been able to carry on his usual work in his usual manner," and that "[i]t is recognized that claimant has *some* difficulty as a result of the noted impairments; * * *." (Emphasis supplied.)

On the hearing the Hearing Examiner stated:

"[I]t is my responsibility to get to the roots of these things. If I can help you I will. I am sympathetic with you, and I notice you do have some slight tremors in your hand but lots of folks work with Parkinson's disease and Governor Browning is practicing law; and he was before me in a hearing—*I don't know whether you know Governor Browning or not but I am sure you do—he is still very active and he has Parkinson's so bad I don't see how he can sign his name but he is still active.*"

The foregoing suggests, and even declares, that Governor Browning was an extraordinary individual in being active in his work even with a bad case of Parkinson's disease. This is an erroneous and prejudicial standard by which to judge appellant.

The above calls to mind the memorable statement of Judge Hemphill in Drafts v. Celebrezze, 240 F.Supp. 535, 538, in which he said:

"Pain was brushed aside as a subjective nonentity. Well reasoned opinions and the obvious purposes of the Act compel that great consideration be accorded to that merciless entity called 'pain'. *The fact that some extra-ordinary individuals can bear it and perform unflinchingly does not mean that*

*such heroics is the 'standard'. The criterion is not even the standard of the ordinary man or the average man; the standard is the individual claimant himself, with all his personal assets and liabilities."*

We are of the opinion that the Hearing Examiner committed reversible error: (1) in using Theberge v. United States, *supra*, as a standard to evaluate disability resulting from pain; (2) that it was error to hold that the Social Security Act should be strictly construed instead of liberally construed to effect coverage; (3) and that the foregoing errors deprived appellant of his disability benefits under the Act, and calls for reversal of the judgment based thereupon.

We come, then, to the evaluation of the medical evidence in the case. The evidence of Dr. Kasselberg was that appellant could not return to work; the evidence of the Personnel Manager of appellant's employer was that Dr. Kasselberg and the employer's physician both agreed that appellant was permanently and totally disabled, and the employer, together with its two insurance companies, agreed that appellant was entitled to, and was granted a pension for permanent and total disability. The evidence of Dr. Myhr was that appellant was unable to work because of his cervical disc syndrome that caused him considerable neck pain, and because of his lumbar spine arthritis. Thirty years before, appellant had been granted 20% disability for arthritis and 30% disability "on nerves" by the Veteran's Administration. It is common knowledge that once a person has the disability of arthritis, it becomes worse as one grows older. At the time of the examination before the Hearing Examiner, appellant had grown more than thirty years older than when his arthritis was detected and ruled a disability by the Veteran's Administration, as service-connected, after World War II.

As against appellant's own testimony and that of his wife, and attending physician for seventeen years, we examine the medical evidence of the Secretary. First, it is to be borne in mind that merely because a physician states that an applicant for social security disability benefits is not suffering from an impairment that precludes him from engaging in substantial gainful employment, and that he should be able to do *some* work, is not substantial evidence that he can engage in substantial gainful activity when viewed in the light of evidence of other doctors who had continuously treated the applicant and testified to the contrary; and in the light of facts reflected in the transcript as a whole; and the evidence of a physician who has been treating such applicant over many years and whose conclusion is that he is totally incapacitated, is substantial evidence as compared with the evidence of physicians who have examined the claimant on *one* occasion, and whose reports are inconclusive and not contradictions of unqualified evidence that claimant is totally and permanently disabled. Branham v. Gardner, 383 F.2d 614 (C.A.6)

Also, a determination of a Hearing Examiner based on the evidence of a physician making a single examination, as contrasted with the evidence of a physician who had been treating claimant over a period of years, would not be sustained by substantial evidence. Teague v. Gardner, 281 F.Supp. 43, 48 (E.D.Tenn.N.D.), Miracle v. Celebrezze, 351 F.2d 361, 379 (C.A.6), Combs v. Gardner, 382 F.2d 949 (C.A.6), Colwell v. Gardner, 386 F.2d 56, 70, 71 (C.A.6).

On the hearing the Hearing Examiner, in addressing a witness about Dr. Ray's report, stated that appellant, "Mr. Floyd said that Dr. Ray didn't examine him." No one knows that Dr. Ray did examine appellant. His report says that he "saw patient at [the Hearing Examiner's] request." Ordinarily, such a report in such language would be accepted as a statement by Dr. Ray that he examined appellant; but, in view of appellant's statement to the Hearing Examiner, that is not clear.

However, assuming that Dr. Ray did examine appellant on behalf of the Hearing Examiner, on one occasion, Dr. Ray reports on narrowing of the lumbar in-

terspaces with mild hypertrophic changes thereabouts, and that there was a definite narrowing of several of the cervical interspaces with hypertrophic changes both anteriorly and posteriorly about these interspaces. It is the narrowing of the lumbar and cervical spaces that is the usual result of arthritis, and it is the narrowing of these interspaces that causes pain. Dr. Ray reported hypertrophic changes in the lumbar region which, he states, are "mild," and discogenic degeneration of the mid-cervical region with old hypertrophic changes. Further, Dr. Ray reports that appellant had arthritic changes in his low back, which were "minimal," and "degenerative disc changes in the mid-cervical region with hypertrophic changes about the interspaces."

Here are all the arthritic conditions which appellant claims he suffers from in his neck and lumbar spine. Dr. Ray's only evidence that he does not suffer from them is that the arthritic changes in the lumbar spine are mild and that the arthritic changes caused by the degeneration of the mid-cervical spine are not stated to be mild, but "old." Dr. Ray also stated there is no evidence of rheumatoid arthritis, and no evidence of "nerve root compression" in either the neck or the low back. No one ever claimed there was any evidence of rheumatoid arthritis, or "nerve root compression," so, as far as that goes, this evidence is undisputed. The point is: Does appellant suffer constant pain? This is a question that, in spite of appellant's evidence to the effect that he is permanently and totally disabled by such pain, Dr. Ray does not answer. He states only: "This patient's subjective symptoms are far out of proportion to the objective findings." This tells us nothing. Appellant testifies that he suffers constant pain; Dr. Ray says these symptoms of pain are far out of proportion to the appearance of appellant's spine, and that his diagnosis of the arthritis in the lumbar spine is "mild," while the arthritis of the cervical spine is "old." Does appellant suffer great and constant pain? Dr. Ray doesn't

say. If appellant does experience pain, Dr. Ray may believe, as the Hearing Examiner does, according to the *Theberge* case, that appellant must endure discomfort and pain and not be totally disabled; and this his work "must do more than hurt, it must substantially aggravate his malady." Theberge v. United States, *supra*. That is wrong and has repeatedly been held to constitute reversible error in appraisal of pain in disability cases. Dr. Ray further stated that: "I do not consider him sufficiently disabled to justify the granting of Social Security Benefits." Nowhere in Dr. Ray's report appears any evidence or suggestion of evidence that appellant can engage *in substantial gainful activity*. Nothing in Dr. Ray's report justifies the denial to appellant of disability benefits.

As to Dr. Hoover's report, his report discloses that he took no X rays of appellant's cervical or lumbar spine, and that his opinion is hearsay or "history," based on the views of someone else not named:

"(1) Degenerative arthritis of the lumbar spine, mild, *by history*, relatively asymptomatic.

"(2) Discogenic disease of the cervical spine, *by history*, relatively asymptomatic."

Dr. Hoover concludes this report, which can be considered of no value, with regard to appellant's arthritic condition, by stating: "This patient's motivation to work is obviously extremely poor." How could Dr. Hoover possibly pass such a judgment on appellant when his report shows that he never asked him anything about his work, except as to three doctors who had "placed him on a total disability, and that the company doctor said he could not work."

At no time did appellant display any motivation not to work or to work. Dr. Hoover knew nothing about him, except during this single examination.

In a remarkably succinct and pertinent opinion, Chief Judge Solomon of the United States District Court for the District of Oregon, in a similar case, Huff-

man v. Gardner, 292 F.Supp. 331, 334, said:

"There is no merit to the Secretary's assertion that the claimant * * * lacked motivation. Conclusional remarks in a letter from a social worker that the claimant has 'difficult emotional problems' and a 'lack of motivation' are insufficient to support the Secretary's findings, particularly when they are not accompanied by supporting information."

There was no supporting information possessed by Dr. Hoover when he made his conclusional remark that "appellant's motivation to work is obviously extremely poor." Dr. Hoover did not know any more about appellant's motivation to work, than he knows about the motivation to work of the writer of this opinion. And yet, this statement of Dr. Hoover about appellant's "motivation to work [being] obviously extremely poor" impressed, to a marked extent, the Hearing Examiner who stated in his decision that the "doubt has been raised as to whether he is motivated to go back to work, *and this doubt is worth consideration.*" (Emphasis supplied.) There was no supporting information to this conclusional remark possessed by Dr. Hoover when he raised this doubt in the mind of the Hearing Examiner. It is without any evidential basis; and for the Hearing Examiner to state this doubt was worth consideration, and so to consider it in the decision denying appellant disability benefits, is so plainly prejudicial and erroneous that, in itself, it calls for reversal. Dr. Hoover's final statement in his report is: "Objective findings do not support the subjective symptoms." This tells nothing, and has no bearing whatever on appellant's engaging in substantial gainful activity.

Dr. Horton examined appellant "primarily for pulmonary" diseases. On orthopedic matters, Dr. Hoover stated he would defer to the findings of Dr. Wendell L. Whittemore, the specialist, to whom appellant had been referred, and who was the last physician to examine appellant.

Dr. Whittemore did not find that appellant's motivation to work was extremely poor or poor in any degree; nor did he report in any way that the subjective symptoms were out of proportion to the objective findings. Dr. Whittemore told of appellant's pain as appellant described it to him without casting any doubts on appellant's claim. Dr. Whittemore's entire evidence is set forth on pages 80 and 82 ante.

Dr. Whittemore, on the one occasion on which he saw appellant, reports, then, that appellant suffers pain from different movements; that the degenerative joint disease in his cervical spine is advanced and old; that "a certain amount of vulnerability to stress is valid," that, in his lower back there is a degree of degenerative joint disease which is mildly advanced and that "[h]is pain appears localized in the lumbosacral area * * *."

Dr. Whittemore's final statement was that in his opinion appellant should be able to move about, handle objects, and perform sustained activities requiring *light* exertion. But the mere fact that a claimant for disability benefits is mobile, and able to engage in some *light* tasks in his home, does not alone establish that he is able to engage in substantial gainful employment precluding recovery of benefits. Randall v. Flemming, 192 F.Supp. 111 (D.C.Mich.)

Of all the Government's medical evidence, Dr. Whittemore is the only one that says or implies that appellant suffers pain. Dr. Ray does not. Dr. Hoover does not. Dr. Horton does not. And yet it is common knowledge that arthritis produces pain, and that pain is one of its expected symptoms. Richardson v. Ribicoff, 205 F.Supp. 802 (E.D.S.C.). All that these three doctors say is that the subjective symptoms are out of proportion to the objective findings. They seem assiduous in avoiding the use of the word "pain," which always accompanies arthritis. Dr. Hoover reports that appellant overreacted to light touch. But what one patient suffering from arthritic pain would react to, in the way of touch, is no

criterion of how another arthritic patient would react. In social security disability cases, great consideration must be accorded pain; the *standard is the individual claimant himself*, with all his personal assets and liabilities, not the ordinary or average man. Drafts v. Celebrezze, 240 F.Supp. 535 (D.C.C.S.). The question is what pain the individual can bear. Coleman v. Gardner, 264 F.Supp. 714 (D. C.W.Va.). If it be conceded, as it must be, that arthritis produces pain and that the standard of how painful such arthritis is, depends upon the individual suffering from it, how can a statement of an observer, that such an individual overacts to someone touching an arthritic joint from which he is suffering, be substantial evidence that he, as an individual, overacts to the pain thus produced?

Doing "some" work, or performing "sustained activities requiring light exertion" gives no clue to the kind of work Dr. Whittemore judges appellant to be capable of.

As well said by Judge McCree, speaking for the court in a case decided this month, Vaughn v. Finch, 431 F.2d 997 (C.A.6):

> "It is the law of this Circuit and of other Circuits that when it is established that a claimant's disabilities foreclose resumption of his usual employment, the burden of going forward shifts to the Secretary, who must present evidence of available employment which he contends can be performed by the claimant in his lessened capacity. Goad v. Finch, 426 F.2d 1388, 1390, 1391 (6th Cir. 1970); Mullins v. Cohen, 408 F.2d 39, 40 (6th Cir. 1969); Davidson v. Gardner, 370 F.2d 803, 823–825 (6th Cir. 1966); Hicks v. Gardner, 393 F.2d 299, 301 (4th Cir. 1968); Carico v. Gardner, 377 F.2d 259, 261 (4th Cir. 1967); Brandon v. Gardner, 377 F.2d 488, 491 (4th Cir. 1967); Boyd v. Gardner, 377 F.2d 718, 721 (4th Cir. 1967); Gardner v. Brian, 369 F.2d 443, 446 (10th Cir. 1966) (en banc); cf. Murphy v. Gardner, 379 F. 2d 1, 5 (8th Cir. 1967).

> "Although it appears that appellant has some capacity for gainful employment and that her educational background, which includes demonstrating sewing machines, managing a gift shop, and doing clerical work in the admininstrative office of a hospital, may make it possible for her to engage in restricted gainful employment, an examination of the record discloses that the Secretary has failed to sustain his burden.

> "None of the doctors who expressed the opinion that Mrs. Vaughn possessed some residual capacity were told what are the physical demands of the light sales work the Secretary found to exist. There was thus no basis in the record upon which they could form an opinion whether appellant could meet such requirements. Although there may be cases where the amount of residual capacity possessed by a claimant will make such a demonstration unnecessary, e. g., Justice v. Gardner, 360 F.2d 998 (6th Cir. 1966), this is not one."

With regard to Dr. Whittemore's phrase, "sustained activities requiring light exertion," the activity which a person must be able to engage in, so as to be unable to claim disability benefits, must be not only gainful but also substantial. Hawkins v. Celebrezze, 210 F.Supp. 341 (D.C.Ark.). Activity does not disqualify a claimant from disability benefits unless it is both gainful and substantial. Hilber v. Ribicoff, 196 F.Supp. 460 (D.C.Mont.).

The general statement of a physician that a claimant could perform "light work" is not substantial evidence that he is able to engage in substantial gainful activity. In Clemochefsky v. Celebrezze, 222 F.Supp. 73, 78 (D.C.Pa.), the court said:

> "Once proper medical evidence, buttressed by subjective evidence from claimant, has shown a sufficiently severe impairment, it must be determined if such impairment, plus claimant's educational and work status, preclude any substantial, gainful activity.

Blankenship v. Ribicoff, 206 F.Supp. 165 (S.D.W.Va.1962). In cases of this kind, where the claimant alleges inability to engage in substantial, gainful activity, *and his personal physician, the man in whose charge claimant has entrusted his health, claims likewise, if examining physicians are to dispute this contention, they must give the medical basis for their opinions. It is not sufficient to say that a man suffers some form of physical impairment yet can do 'light work.'* It must be shown medically that he can perform the physical activities certain jobs require without serious aggravation to present physical impairment or to general health. Otherwise, the Hearing Examiner's findings would amount to pure speculation." (Emphasis supplied.)

In Popovich v. Celebrezze, 220 F.Supp. 205, 207 (D.C.Pa.), Chief Judge Gourley was called upon to determine whether the testimony of an expert medical witness that an applicant "could do light work," constituted "substantial evidence" to support a finding that claimant was able to engage in substantial gainful employment, and he held that such testimony did not constitute such substantial evidence.

In Massey v. Celebrezze, 345 F.2d 146 (C.A.6), this court said: "[I]n proving that an applicant is not precluded from performing substantial gainful employment, it is not enough to rely upon testimony that a claimant can do 'light work.' "

Denial of disability benefits to a claimant on the basis that although he is not able to return to his former employment, he is still capable of engaging in some gainful activity must be supported by findings as to the kind of work the claimant is still capable of performing. Hall v. Celebrezze, 347 F.2d 937 (C.A.4).

It is not enough that an applicant can perform sustained activities requiring "light exertion." Such light work must be specifically described.

The medical evidence introduced by the reports of the Social Security physicians did not disclose that appellant could engage in substantial gainful activity.

Moreover, a single examination by a physician employed by the Social Security Administration who saw a claimant only once, as contrasted with the evidence of a practicing physician who has been treating the claimant for seventeen years, is not sustained by substantial evidence. Teague v. Gardner, 281 F.Supp. 43, 48, (D.C.E.D.Tenn.N.D.), Miracle v. Celebrezze, 351 F.2d 361, 379 (C.A. 6), Combs v. Celebrezze, 382 F.2d 949 (C.A.6), Colwell v. Gardner, 386 F.2d 56, 71 (C.A.6); Sebby v. Flemming, 183 F. Supp. 450 (D.C.Ark.).

On the evidence of the physicians employed by the Social Security Administration, the Hearing Examiner, in his decision, read out of the Dictionary of Occupational Titles, and, among thousands of jobs therein listed, stated that he was of the opinion that appellant could perform such occupations as working in a warehouse building, boxing and packing merchandise of all types, of light weight, for storage or shipment, putting merchandise of light weight on shelves in wholesale or retail establishments, basket weaving, chair caning, running errands in factories, shops and wholesale houses, delivering messages, such as telegrams, clean-up flunky, and bed-maker. For a man who, under the undisputed evidence, had continual pain in his hips and legs, and who could only stand up for a short time, or sit down for a short time, these conclusions of jobs he is able to perform are not sustained by substantial evidence, especially in view of the fact that no Vocational Counselor, or other witness, testified or reported as to what physical demands were entailed by such work, and no witness, nor the Hearing Examiner himself, could form an opinion as to whether appellant could meet such requirements. It is not proper for a Hearing Examiner, merely on the evidence of a physician that he considers a claimant could perform activities requiring light exertion, to read from the Dictionary of Occupational Ti-

tles a list of jobs therein set forth, and enter findings that the claimant could perform all or any of them without further evidence.

The Hearing Examiner could not properly take notice of any job allegedly available to claimant outside the testimony before him, and could not properly assume the existence of such a job. Selewich v. Finch, D.C., 312 F.Supp. 191, 196.

It may also be remarked, while the appellant was testifying that his legs and hips were bursting, the Hearing Examiner remarked that appellant's physicians "don't say you are disabled to do an inspection job like sitting where you are." "Along these same lines, plaintiff is not prejudiced by reason of the fact that she has not taken to selling apples or pencils on a street corner. 'It is no answer that the claimant may be theoretically capable or performing some one of the "nonphysical, observational" jobs contained in an exhaustive list covering places and circumstances utterly irrelevant to her situation.' Thomas v. Celebrezze, *supra*, 331 F.2d 551, at 546." Amick v. Celebrezze, 253 F.Supp. 192, 195 (D.C.S.C.).

It is said that the rather substantial range of activities in which claimant testified he participates is impressive. The activities in which claimant testified he participates are shown by his testimony:

"Q. Do you help your wife with the housework?

A. Some.

Q. What do you do?

A. I help mop the floor—wash dishes some.

Q. Do you do any cooking?

A. I help her cook.

Q. How about operating the washing machine?

A. I don't have nothing to do with that.

Q. How do you heat your house—with electricity, gas, or coal?

A. Gas.

Q. Is it a two-story house or a one-story house?

A. One.

Q. How many steps do you have leading into the house approximately?

A. About three steps.

Q. How much walking do you do on an average day in miles or blocks?

A. I have to walk some. I go up to the store and back and down to the filling station and back, and I walk around in the yard.

Q. Break that down into blocks for me, if you can, as your best judgment dictates.

A. About 8 blocks.

Q. Do you have a garden?

A. No, sir.

Q. Do you mow the lawn?

A. Yes, sir.

Q. Do you have a power mower?

A. Yes, sir.

Q. How do you start it?

A. Pull a rope.

Q. Do you cut the lawn all at one operation or do you rest?

A. I get the back yard one day and the front yard at another time.

Q. Have you earned any money at all since you left Armour?

A. Not a dime.

Q. How far is it to the grocery store?

A. I'll say it's half a block.

Q. If the groceryman gave you 25 pounds of groceries or a 25-pound sack of flour, could you carry it 2 blocks without any trouble, in your opinion?

A. When I pick it up a pain grabs in each hip.

Q. In other words, you don't think you could carry 25 pounds 2 blocks?

A. I wouldn't even pick up 25 pounds.

Q. Do you drive an automobile?

A. Some.

Q. How many times a week?

A. Maybe once a week.

Q. What was the longest trip you made in the last 12 months, you doing the driving?

A. About 74 miles.

Q. One way and back?

A. Yes, sir.

Q. In other words, nearly 150 miles a round trip?

A. Yes, sir, but one day I went up there and spent the night and come back the next day.

Q. Ordinarily you just drive short distances?

A. Yes. I can't hold out to drive.

Q. Did you have any bad results from driving that far?

A. Yes, sir. I was moving around all the time. You get to aching and hurting so that you've got to keep moving around.

\* \* \*

Q. How do you spend your time? Do you do any hunting or fishing or anything like that?

A. I spend the most of it in the back yard.

Q. Doing what?

A. I've got a hobby cutting out spice racks.

Q. You mean cutting holes in it?

A. It's a little rack. It's 15 inches high and 11¼ inches wide and 2¼ inches thick. It's got three shelves in it—a spice rack, and you hang them on the wall.

Q. Do you sell those things, or do you make them for friends?

A. I just make them for folks and friends.

Q. You don't sell them?

A. No, sir.

Q. That is a right neat job if it is the same kind I see. Do you have special equipment to do that with?

A. I get this wide paneling. I've got one of these little jigsaws to saw them out with.

Q. You can saw any size hole you want to?

A. I don't saw any holes. I just saw them out, you know, (indicating) that way on the side.

Q. Curlicues, we call them sometimes?

A. Yes, and crosspieces. I decorate the crosspieces.

Q. Do you glue those pieces together?

A. Glue them and nail them.

Q. When the glue dries you have got something real tight to hold?

A. Yes, and I make a wooden chain. I take a piece of wood just as big as you want it from an inch up and start making links on it and work it on out to as long a chain as you want, and on the end I put a piece on it and cut out a ball between four slots, and it rolls inside the four slots and they never come out. It's all made together.

Q. Is that little shop you have in the basement, or where is it?

A. A little 10 by 10 building in the back yard. I just do that for pastime.

Q. That is pretty good pastime. It is very interesting, isn't it?

A. Yes, sir. It beats sitting around with nothing to do. It get monotonous sitting around."

None of the foregoing, according to the decided cases, constitutes substantial gainful activity. In the early case of Randall v. Flemming, 192 F.Supp. 111, 128 (W.D.Mich.), the late Judge Starr stated:

"In his decision the referee stated: 'The daily activities of the claimant would not appear to be those of a totally disabled individual.' The law does not require that plaintiff show that he is bedridden or completely helpless or that he is *totally* disabled, in order to qualify for disability bene-

fits. The mere fact that he is mobile and is able to engage in some light tasks at his home does not alone establish that he is able to engage in substantial gainful activity. Certainly the fact that plaintiff has made sincere efforts to engage in some gainful employment but has not succeeded because of his physical condition should not bar him from the benefits provided by the act."

In Clemochefsky v. Celebrezze, 222 F. Supp. 73, 77, the court said:

"The Examiner expressly relies on claimant's statement that he is able to drive his car about once a week, and go fishing a few times a month and take care of his personal requirements, as showing an ability to work. But the claimant's ability to perform the simplest of tasks should not disqualify him from benefits under the Social Security Act. The disability which the claimant must show need not be commensurate with 'helplessness, bed ridden or at death's door.' "

In Prestigiacomo v. Celebrezze, D.C., 234 F.Supp. 999, 1003, the court said:

"The Hearing Examiner in the present case seemed to lay stress on the fact that the evidence showed that petitioner was able to do some of her housework, and that she 'worked her flowers' once or twice a week for an hour or two. This finding, however, is not sufficient to justify the conclusion that the petitioner is able to engage in substantial gainful activity."

In Mullen v. Gardner, D.C., 256 F. Supp. 588, 591, the court said:

"The Hearing Examiner also seemed to rely in part on plaintiff's ability to take care of her personal needs, to do some simple household tasks, and to drive an automobile on occasion. Such findings cannot constitute substantial evidence for a denial of disability benefits. 'The law does not require that plaintiff shows that he is bedridden or completely helpless or that he is totally disabled, in order to qualify for disability benefits. The mere fact

that he is mobile and is able to engage in some light tasks at his home does not alone establish that he is able to engage in substantial gainful activity.' "

The activities about which claimant testified he participated in, in our opinion—helping his wife with the housework, helping to mop the floor, and wash the dishes, helping her to cook, walking about eight blocks a day to the store, to the filling station, and in his yard, cutting half the grass on their lot with a power mower one day, and half, the next day, driving the automobile twice a week, 74 miles a day, making light wooden chains as a hobby, as a pastime to avoid having nothing to do—none of these activities would constitute gainful employment.

Appellant's inability to engage in substantial gainful activity was supported by substantial evidence in the record as a whole.

Accordingly, the judgment should be reversed and the case remanded to the Secretary for allowance of disability benefits.